THE UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| HILDA SOLIS, Secretary of Labor, U.S. Department of Labor,[1] | Hon. Joseph H. Rodriguez |
| Plaintiff, | Civil Action No. 05-2264 |
| v. | **OPINION & ORDER** |
| JAMES DOYLE, et al., | |
| Defendants. | |

APPEARANCES:

Andrew Karonis, Esq.
Suzanne Dimitrio, Esq.
Office of the Solicitor
U.S. Department of Labor
201 Varick Street, Room 983
New York, NY 10014
  Attorneys for Plaintiff Hilda Solis, Secretary of Labor

Keith R. McMurdy, Esq.
Fox Rothschild LLP
100 Park Avenue Suite 1500
New York, NY 10017
  Attorneys for Defendant Cynthia Holloway

James Doyle
PO Box 8638
141 Ganttown Road
Turnersville, NJ 08012
  Pro se Defendant

Mark A. Maccariella
910 Lincoln Drive
Voorhees, NJ 08043
  Pro se Defendant

---

[1] Pursuant to Fed. R. Civ. P. 25(d), Secretary Hilda Solis has been substituted for former Secretary Elaine L. Chao.

## I. <u>BACKGROUND</u>

On April 28, 2005, the Secretary of Labor filed a Complaint pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1132(a)(2) and (5) to obtain relief for alleged violations of the statute by Defendants the Professional Industrial & Trade Workers Union ("PITWU") Health and Welfare Fund (the "Fund")[2] and four individuals - James Doyle, Cynthia Holloway, Michael Garnett, and Mark Maccariella.  (Complaint ¶¶ 5-9.)

In her Complaint, the Secretary alleged that the four individuals had various roles with respect to the Fund from 2001 through 2003.  (Compl. ¶¶ 6-9.)  All four allegedly were fiduciaries (as that term is defined under ERISA, 29 U.S.C. § 1002(21)(A)) of the Fund and thereby either:

> [E]xercised discretionary authority or discretionary control respecting the management of the Fund or exercised any authority or control respecting management or disposition of the plan assets of the Fund or had discretionary authority or discretionary responsibility in the administration of the Fund.

---

[2] The Secretary alleged that the Fund is named as a Defendant pursuant to Fed. R. Civ. P. 19 solely to assure that complete relief can be granted.  (Complaint ¶ 5.)  It allegedly held the assets of an employee welfare benefit plans within the meaning of ERISA, 29 U.S.C. § 1002(1) which states:

> The terms "employee welfare benefit plan" and "welfare plan" mean any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, (A) medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment, or vacation benefits, apprenticeship or other training programs, or day care centers, scholarship funds, or prepaid legal services, or (B) any benefit described in section 302(c) of the Labor Management Relations Act, 1947 (other than pensions on retirement or death, and insurance to provide such pensions).

2

(Id.)  The Secretary also alleged that Holloway, Garnett, and Maccariella were "parties-in-interest" with respect to the Fund (as that term is defined under ERISA, 29 U.S.C. § 1002(14)(A)).[3]  Each Defendant is alleged to have violated the statute in failing to administer the assets of the Fund for the exclusive purpose of providing benefits to the Fund's participants and beneficiaries.

Defendant Holloway was a named trustee to the Fund from approximately May 1, 2001 to September 22, 2002, (Compl. ¶ 7), and Garnett was a trustee to the Fund from May 30, 2002 to August 19, 2002, (Compl. ¶ 8).  In addition to their roles in connection with the Fund, three of the individual defendants (Garnett, Maccariella, and Doyle) served as owners or officers with various companies connected to the Fund.  Both Garnett and Maccariella served as owners of companies called Privilege Care, Inc. ("PCI") and North Point PEO Solutions, Inc. ("NP").  (Compl. ¶¶ 8-9.)  According to the Complaint, PCI and NP were professional employer organizations ("PEOs") which entered into "so-called service contract agreements with employers" to provide human resource type services and access to health insurance provided by the Fund through "so-called collective bargaining agreements" with PITWU, the sponsor of the Fund.  (Id. ¶ 10.)  Garnett was the owner from May 21, 2002 to August 19, 2002, and Maccariella was the owner from about August 19, 2002 to June 1, 2003.  (Compl. ¶¶ 8-9.)

From January 1, 2002 to June 1, 2003, Defendant Doyle was the owner of Privilege Care Marketing Group, Inc. ("PCMG"), an entity which provided marketing

---

[3] Under ERISA, a "party in interest" to an employee benefit plan is "(A) any fiduciary (including, but not limited to, any administrator, officer, trustee, or custodian), counsel, or employee of such employee benefit plan . . . ."  29 U.S.C. § 1002(14)(A).

3

and billing services to PCI and NP, signing up employers to purchase health insurance coverage under the Fund. (Compl. ¶ 6.)

According to the Complaint, certain PITWU members could obtain medical benefits from the Fund. (Id. ¶ 11.) To do so, the member's employer would need to pay certain monthly fees to PCMG, PCI and NP. (Id.) Payment of fees at issue flowed from the employer to PCMG, which retained a certain amount for administrative fees, sales commission, and billing fees, and then to PCI/NP. (Id.) Upon receipt of the funds from PCMG, PCI/NP would transfer a portion of the funds to a third-party administrator which was charged with processing and paying health claims made by PITWU members. (Id. ¶ 12.) A portion of the funds received by PCI/NP would be paid to PITWU as "dues." (Id.) The Secretary has alleged that PCI/NP retained the remainder of employer contributions. (Id.)

> The Secretary also alleged that Doyle, Garnett, and Maccariella:
>
> failed to administer the Fund's assets for the exclusive purpose of providing benefits to the Fund's participants and beneficiaries and defraying reasonable expenses of administering the plans under . . . 29 U.S.C. § 1104(a)(1)(A); and . . . failed to administer the Fund's plan assets with the care, skill and diligence that a prudent fiduciary would have used in like circumstances in violation of ERISA . . . § 1104(a)(1)(B).

(Compl. ¶¶ 15-17.) As to Holloway, the Complaint asserts that, from November of 2001 through September of 2002, Holloway "failed to monitor and correct the diversion of employer contributions to the Fund by PCI and NP," (Compl. ¶ 14), and from January 1, 2002 to September 22, 2002, she "failed to monitor and correct the diversion of employer contributions to the Fund by PCMG," (Compl. ¶ 13). Thus, she is alleged to have:

4

> failed to administer the Fund for the exclusive purpose of providing benefits to the Fund's participants and beneficiaries and defraying reasonable expenses of administering the Fund under . . . 29 U.S.C. § 1104(a)(1)(A); and . . . failed to administer the Fund with the care, skill, prudence and diligence that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims under ERISA . . . § 1104(a)(1)(B).

(Compl. ¶ 18.)

In addition, the Complaint has alleged that by (I) knowingly participating in the alleged acts and omissions of their co-fiduciaries, (ii) by enabling co-fiduciaries to commit certain fiduciary breaches, and (iii) by failing to make reasonable efforts to remedy the breaches of fiduciary duty by co-fiduciaries, the Defendant fiduciaries are liable for the breaches of fiduciary responsibility committed by their co-fiduciaries. (Compl. ¶¶ 19-21, citing 29 U.S.C. § 1105(a)(1)-(3).)

The Secretary of Labor seeks restoration of losses to the Fund as a result of Defendants' alleged ERISA violations. The Court also has been asked to enjoin the Defendants from serving as fiduciaries or service providers to an ERISA-covered plan.

## II.  ARGUMENTS

Essentially, Doyle, Garnett, and Maccariella are accused of misuse and misappropriation of assets entrusted to them for payment of health benefits, while Holloway allegedly did not discharge her fiduciary obligation to ascertain the financial condition of the Fund despite warning signs that "something was amiss." The Secretary has asserted that PITWU, PCMG, PCI, and NP were sham entities set up to sell insurance while invoking ERISA preemption to evade state insurance laws. While over $7.4 million was collected, allegedly constituting assets belonging to the Fund, it has been argued that more than $4.7 million was retained in breach of the Defendants'

fiduciary duties, and less than $2.7 million was used to pay benefits. As of September 2003, Plaintiff originally argued, nearly $10 million in claims remained unpaid. There were allegedly 408 formal complaints filed with the Department of Labor regarding PITWU Fund participants' unpaid medical bills, and seven states entered cease and desist orders banning Defendants from selling health insurance in their jurisdictions.

Finally, the Secretary asserts that under the "governing documents" approach, all employer contributions were plan assets, regardless of the form in which they were remitted. Because all money paid to PCMG and/or PCI/NP were plan assets of the Fund, the argument continues, the Defendants diverted plan assets to entities that served no discernable purpose.

### III. PROCEDURAL HISTORY

A bench trial was held in this matter October 19 through 26, 2009. At the outset of the bench trial, Defendant Mark Maccariella voluntarily accepted a default judgment against him. Accordingly, the Court entered a consent judgment and order on December 7, 2009, enjoining Maccariella from future activity in this area, and requiring him to pay $195,317.

Despite numerous continuances granted at his request, Michael Garnett failed to appear for trial even though he was ordered to do so by this Court. Therefore, default judgment will be entered in favor of the Secretary of Labor and against Michael Garnett, as discussed on the record during the trial.

As to Defendants Doyle and Holloway, the Court has adduced the following facts from the evidence introduced at trial.

## IV. **FINDINGS OF FACT**

It is undisputed that in 2000, an individual named David Weinstein formed PITWU.

At that time, Cynthia Holloway owned Employers Depot, Inc. ("EDI"), a PEO which she formed in 1989. (Tr. 398.) Holloway was made aware of PITWU by her health insurance broker. She spoke with a representative of PITWU, and asked attorney Neil Goldstein to provide her with verification of the union, which he did. (Tr. 400, 404.) Goldstein later became the attorney for the Fund. (Tr. 403.)

On May 1, 2001, Cynthia Holloway and three other trustees executed a trust agreement to establish an employee welfare and benefit plan for the PITWU. (Tr. 348-49; Trial Exhibit 1.) The trust agreement created a trust fund for the PITWU plan, to be funded by participating employers' contributions. (Tr. 349-50.) Holloway had authority to sign checks drawn on the claims and general accounts of the Fund. (Tr. 351.)

Similar to PCI/NP, between 2001 and 2003, EDI recommended the Fund as one possibility to its clients seeking group medical coverage. (Tr. 389, 411.) Thus, Holloway was an employer/trustee. (Tr. 405.) In May 2001, the participating employers were EDI and Employers Consortium, Inc. ("ECI"). (Tr. 406.)

Throughout the life of the Fund, there were trustees, counsel, an actuary, and claims administrators. (Tr. 215; 407-408, 416.) Counsel for the Fund never expressed a concern that PITWU was not a valid union or that the Fund was not a valid multi-employer fund. (Tr. 432.) The Fund made annual filings to the federal government. (Tr. 407.)

In January, 2002, ECI terminated its relationship with PITWU, and its employer trustee resigned from the Fund, to be replaced by David Weinstein of PCI.  (Tr. 413-15.)

In January 2002, a collective bargaining agreement was entered into by PCI and PITWU; the agreement obligated PCI to submit certain dollar amounts to the Fund in order for employees to receive benefits under the Fund.  (Tr. 136-37; Trial Exhibit 10.)  At the same time, NP and PITWU entered into an identical agreement.  (Tr. 138-39; Trial Exhibit 11.)

PCI and NP were effectively the same organization in that they shared consultants, office space, owners, and employees.  (Tr. 122-23.)

The PITWU-PCI/NP CBA provided that PITWU had "been designated by a majority of employees in certain client companies of [PCI/NP] as their exclusive bargaining representative for those terms and conditions of employment controlled by [PCI/NP] as per its "client Service Agreement."  (Trial Exhibits 10, 11.)

The "client Services Agreement" or PCI/NP PEO Services Contract, which was to be completed by employers to obtain PITWU health insurance for employees, allowed for the option of non-union participation.  (Tr. 129:5-8; 187; Trial Exhibits 12, 13.)

Doyle and Maccariella testified, however, that the employees who wanted to receive PITWU health and welfare benefits had to be union members, and pay union dues.  (Tr. 64:10-15; 198-99.)

When an employer executed the PCI/NP PEO Services Contract, its employees would gain access to the Fund through the PITWU-PCI/NP CBA.  (Tr. 199.)

Also in January of 2002, on behalf of PCMG, James Doyle entered into a Marketing Service Agreement with Weinstein and PCI to market PCI's services. (Trial Exhibit 17.) An administrative fee payable to PCMG was set by that Agreement.

Doyle was the owner and President of PCMG, which marketed PEO services, including access to the health benefits of the Fund, for PCI/NP from January 2002 through the end of October 2002. PCMG provided marketing services for other entities as well. Similarly, entities other than PCMG marketed the PEO services of PCI/NP, and received compensation for doing so. (Tr. 225-26.)

The amount charged to each participant was to be remitted in the form of two checks, one to PCI/NP for PEO services and/or participation in the health and welfare fund and union dues, and the second to PCMG for administrative expenses, which could include administrative service fees, commissions to sales consultants, or fees for any additional coverages elected such as gap insurance.[4] (Tr. 131-132, 138, 537; Trial Exhibit 27.) Doyle testified that the compensation amounts were "compatible to what the general market for PEO services bears." (Tr. 543.) This testimony was not challenged.

PCMG provided monthly reports to PCI/NP, accounting for funds collected and forwarded to PCI/NP; in turn, PCI/NP reported the numbers and appropriate amounts to the union and health and welfare fund. (Tr. 241-42.) For every paper bill, PCMG also charged a billing fee. (Tr.556-57.) PCMG also paid out certain union dues. (Tr. 579.)

---

[4] According to the PCMG profit and loss detail, January 2002 through May 2003, payments in the amounts of $1,145, $1,192.50, $14, 247, and $4,000, totaling $20,584.50, were made for gap insurance. (Tr. 253-56.) There may have been another $13,000 paid. (Tr. 258.)

March through June of 2002, Oak Tree Administrators served as the third party administrator for the Fund. (Tr. 419-20.) As of July 1, 2002, Brokerage Concepts, Inc. took over as claims administrator. (Tr. 420.)

On April 23, 2002, Cynthia Holloway participated in a meeting with third party administrator Oak Tree, where she learned that there were many pending claims. (Tr. 352.) At that point, Oak Tree had replaced Union Privilege Care, owned by David Weinstein, as third party administrator for the plan, and Oak Tree was not clear on whether any claims had been paid since November of 2001. (Tr. 353-54.)[5]

---

[5] In 2001, Kevin Morgan, as a resident of Arkansas, was part of a counseling organization called Landing, Inc., which employed three or four people. At that time, PITWU provided health insurance for Landing, Inc., which was trying to establish a facility in Virginia. Kevin Morgan testified that to his knowledge, he was never a member of a union. Kevin Morgan's family's larger medical expenses, such as the cost of a CT scan, were not paid by PITWU. Morgan stopped participating in PITWU the last quarter of 2001; he also left Landing, Inc. at the end of 2001.

In January 2002, Windsor Benefit Consultants introduced Richard Brown's company, Union County Florist Supplies out of New Jersey, to the Fund. (Tr. 291-302.) Eighteen of Brown's employees were offered health insurance through PITWU, due to the cost savings it presented. (Tr. 292.) Brown met two union officials, who told him that PITWU was an organization that was able to bring under its umbrella small businesses for the purpose of medical benefits and payroll, but that there was no interest in unionizing the employees. (Tr. 293.) Brown received invoices from PCI/NP, and wrote two checks on a monthly basis, one to PCI and one to PCMG. (Tr. 296.)

PCI/NP also provided payroll services for Union County Florist Supply. (Tr. 296.) At some point, the Florist Supply experienced problems with their payroll because PCI failed to remit payroll taxes to the IRS. (Tr. 297.) In addition, medical claims were not paid. (Tr. 298.) Brown recalls speaking to Cynthia Holloway, who he thought was an employee of NP, toward the end of his relationship with PCI/NP. (Tr. 298-300.) In November of 2002, Brown sent a termination notice to Maccariella because PCI/NP were not paying claims. (Tr. 303, 305.)

As a result of having to pay medical expenses out-of-pocket, and because collection proceedings were instituted against Brown and his employees due to about $10,000 in unpaid medical bills, Union County Florist Supply sued Windsor Benefits Consultants. (Tr. 299-301.) That litigation ended in a settlement. (Tr. 301.)

In mid-2002, New Heritage Realty, an employer of three to five individuals, provided its employees with a health plan – the Fund. New Heritage acquired this

On May 1, 2002, Cynthia Holloway and another trustee appointed David Weinstein as a trustee of the Fund, although Holloway admitted she had general concerns about Weinstein. (Tr. 355, 360; Trial Exhibit 15.)

Michael Garnett became a trustee of the Fund when he bought PCI on May 21, 2002, and performed an internal audit. (Tr. 123.) He found that certain people were

---

health insurance through an insurance salesman and paid for it by submitting two checks to Privilege Care on a monthly basis. Privilege Care did not provide New Heritage with any services other than access to health benefits and gap insurance to cover the health insurance deductible of approximately $1000. The employees of New Heritage were not considered "unionized," and they were not aware of any CBA in place between New Heritage and PITWU.

Elliot Davis, a dentist in New York, participated in the Fund from January 2002 through December 2002. Davis had one employee at the time; she was not considered to be part of any union, as Davis was not aware of any CBA between his office and PITWU. Davis paid for this health insurance by submitting two checks on a monthly basis. Davis was not aware of any services that PCI/NP provided him other than access to PITWU health benefits. Davis became concerned about the Fund on one occasion when a certain medication was not covered with a standard co-pay, but only half of the cost was reimbursed. He complained, but never received a response.

In March of 2002, Diane Lodrago was the cash flow manager for Premier Foods out of New Jersey when Premier switched health plans to PITWU "to get cheaper insurance." (Tr. 262-63.) Lodrago considered PITWU her health insurance company, not a union. (Tr. 264.) Although her claims were initially paid, later claims were not paid. (Tr. 268.) The calls Lodrago made to the number on her insurance card only led to a run-around; she recalls dealing with Oak Tree Administrators and Brokerage Concepts, but did not get satisfaction regarding her claims. (Tr. 268-271.) In June of 2002, Lodrago left Premier Foods. (Tr. 272-73.) In April, May, and June, 2002, Premier Foods wrote checks to NP, which were bank stamped as deposited by NP. (Tr. 278-81.)

Sebastian Monastero, a resident of Illinois, was "affiliated" with New Heritage in 2002, which he defined as "in partnership in business together." (Tr. 35:9-12.) In March of 2003, Monastero's wife incurred medical bills of between $30,000 and 40,000, which were never paid because "PITWU and Privilege Care were un-contactable, nowhere to be found." (Tr. 33:5-6.) Monastero testified that the plan kept changing administrators and phone numbers, and when he called the administrators to complain he learned that the administrators were not being paid by Privilege Care and PITWU. (Tr. 39-40.) Nonetheless, Monastero elected to make payments to Privilege Care through August 2003 in order to remain insured.

There are no signed enrollment forms in evidence from any of these employers.

not eligible to participate in the Fund, so he asked that those individuals be moved out of the Fund. (Transcript 143-44; Trial Exhibit 16.)

If people ceased participating in the Fund, no contributions to the Fund would be made by PCI or PCMG. (Tr. 144-45.)

Holloway attended another meeting in connection with the Fund on May 30, 2002. (Tr. 361; Trial Exhibit 37.) At the May 30, 2002 meeting, Oak Tree informed those present that it still was not able to obtain the necessary financial information and documents from Union Privilege Care relating to prior claims and expenses; therefore, the accountant was unable to provide the trustees with a financial report, and no actuary could have performed a study. (Tr. 362-63; 367-68.) At that same meeting, Weinstein's resignation was accepted, and Garnett was appointed. (Tr. 424.)

As chief operating officer for PCI from May 21, 2002 to August 19, 2002, Garnett signed checks for PCI, including checks transferring employer contributions to the Fund. (Tr. 124-25.)

Garnett claims he resigned in writing, but never produced a copy of the letter, nor did Garnett report a diversion of hundreds of thousands of dollars from the Fund to law enforcement authorities before he abandoned his position on August 19, 2002. (Tr. 123:6-13; 124:21-24.)

On August 19, 2002, Mark Maccariella purchased a note held by David Weinstein against Michael Garnett. (Tr. 125:4-7; 184-85.) Before he did so, Maccariella had attorneys review the collective bargaining agreements, the PEO Services Contracts, and ERISA, and Maccariella was advised that "everything was fine." (Tr. 216.) Maccariella defaulted Garnett and took over PCI/NP. (Tr. 184-85.)

Maccariella operated PCI/NP from August 20, 2002 to March of 2003, when PCI/NP ceased operations. (Tr. 123-24; 185.)   Maccariella testified that PCI/NP instructed PCMG to forward a set amount of dollars to PCI/NP pursuant to the contracts between them, and PCMG honored those agreements by forwarding all monies that were required of them by the PEO services agreement by and between PCMG and PCI/NP. (Tr. 249:7-17.) Accordingly, Maccariella collected the dues that were to be forwarded to the PITWU and wrote checks payable to PITWU representing contributions of employers to PCI/NP for Fund health benefits. (Tr. 217-19; Trial Exhibit 33, 34.) Maccariella also signed checks on behalf of PCI/NP which were funded from non-forwarded contributions of employers. (Tr. 189: 4-6; 125: 8-11.) Maccariella requested that PCMG perform billing services for PCI, because he had fired his billing person. (Tr. 579.)

On September 20, 2002, Holloway attended another meeting relating to the Fund. (Tr. 368.) At that time, a new third party administrator, Brokerage Concepts, advised the trustees of problems relating to the lack of funding to pay claims because PCI/NP were not making contributions to the Plan; Brokerage Concepts also advised the trustees of problems regarding the lack of information and paperwork. (Tr. 369.)

At some point, Holloway instructed the Fund's attorney "to bring some accountability to the Fund, but he asked [Holloway] to talk to the trustees about that." (Tr. 386.)

Holloway took steps to try to get membership information from PCI, including seeking the assistance of Fund counsel to obtain that information. (Tr. 425-26.)

Holloway did not instruct the Fund's attorney to initiate a lawsuit against the trustees, PCI/NP, PCMG or Union Privilege Care. (Tr. 386-87.) She did not demand mediation of her dispute with the other trustees regarding administration of the Fund, and she did not contact the Department of Labor to complain about the lack of funding, lack of financial accountability, or "chaotic state of affairs." (Tr. 387-88.) She did not demand an audit of PCI/NP or PCMG, and did not seek the removal of any trustee. (Tr. 394-95.)

On September 27, 2002, Cynthia Holloway resigned as a trustee to the Fund. (Tr. 371; Trial Exhibit 38.) In her letter of resignation, Holloway outlined the reasons that prompted her decision to resign. Among them was the lack of financial accountability for contributions to the Fund and resultant lack of funding to pay claims, described as "vulnerability of the Fund due to actions taken by membership that has created insolvency of the Fund." (Tr. 372-73; Trial Exhibit 38.)

An additional reason that Holloway listed for her resignation was the issuance of cease and desist order by multiple states "based on the representation by other membership/trustees that PITWU [was] an insurance program." (Trial Exhibit 38.) A response to the cease and desist orders was ordinarily drafted by Neil Goldstein, the attorney for Fund, to the effect of "this is a union-sponsored plan, it is not insurance, you state commissioners don't have jurisdiction over this." (Tr. 376.)

Subsequent to September of 2002, Holloway continued to be active in the administration and correction of Fund issues. She continued to seek out payment of outstanding claims, continued to contact people to obtain additional information, and continued to seek the advice of counsel. (Tr. 427.)

In October 2002, there was a meeting at the office of Benefits Concepts; the topic was that the Fund was underfunded. Those present, including Maccariella and Cynthia Holloway, decided to increase the rates. (Tr. 210.)

In December 2002, Southern Plan Administrators had taken over from Brokerage Concepts as administrator of the Fund. (Tr. 429.)

Holloway's company, EDI, reached into its own pocket to satisfy its clients' claims that were not paid by the Fund, and EDI sought to work out resolutions with health care providers on behalf of Fund participants. (Tr. 429.) Additionally, Holloway sought to obtain payment of claims on behalf of Fund members through Southern Plan's administration. (Tr. 430.)

After PCMG stopped marketing for PCI/NP, it continued to provide billing and administrative services to those entities through May 2003, when it terminated its contracts with PCI/NP. (Tr. 545.) Doyle testified that PCMG made a net profit of $112,788.13. (Tr. 545.)

PCI/NP are no longer in business.

Of the checks reviewed, the various employer participants forwarded $6.6 million to PCMG[6]; $4.5 million was submitted as "check 1" and $2.1 million was submitted as "check 2." Of this amount, PCMG forwarded to PCI/NP $3.1 million. Weinstein's wife's contracted employers submitted an additional $816,000 directly to PCI/NP. So, PCI/NP took in approximately $3.9 million. PCI/NP forwarded $2.1 million to third party administrators and medical providers. PCMG sent an addition $645,000 to third

---

[6]There is no indication in the record of how many participants were billed at each rate. Nor is there any information as to ECI/EDI's contributions.

party administrators and medical providers. The Secretary has characterized any monies that were not passed along to the medical providers as having been misappropriated under "the guise of exorbitant sales commissions, union dues and administrative fees [in] violation of § 405(a)(2) of ERISA." (Pl. Response to Holloway's Post Trial Brief, p. 13.) Further, the Secretary argues that it is the Defendants' burden to establish that $4.7 million of what was paid by employers and not used to pay claims "was used to defray reasonable plan costs." (Id. at p. 14.)

Doyle testified that the $1,302,851.72 reflected on Trial Exhibit 30 was paid out by PCMG to consultants and their management representatives in the form of consulting fees, but not all of that money had to do with the Fund. (Tr. 544.)

## V. ANALYSIS

In accordance with ERISA, a fiduciary[7] has a duty to act "for the exclusive purpose of (I) providing benefits to their participants and beneficiaries; and (ii) defraying reasonable expenses of administering the plan." 29 U.S.C. § 1104(a)(1)(A). In satisfying those duties, a fiduciary must discharge his duties with respect to a plan with

---

[7]Under ERISA, a "fiduciary" is defined as follows:

Except as otherwise provided in subparagraph (B), a person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan. Such term includes any person designated under section 405(c)(1)(B).

29 U.S.C. § 1002(21)(a).

the "care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B).

Absent a showing of failure to comply with ERISA § 404(a)(1), a fiduciary may be liable for breaches of fiduciary responsibility by a co-fiduciary if:

> (1) he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach;
>
> (2) by his failure to comply with section 404(a)(1) [29 U.S.C. §§ 1104(a)(1)] in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or
>
> (3) he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach . . . .

29 U.S.C. § 1105(a).

In this case, the Secretary introduced no evidence to show that the amount of money coming into the Fund was too low for the number of participants in the Fund. (Tr. 474.) The Secretary acknowledges there was no evidence that there were any funds missing from the PITWU Fund; all accounts show that the employers made all required contributions. (See, e.g., Tr. 25: "[w]e do not allege that defendant Holloway failed to collect contributions from employers.") In addition, there was no testimony to the effect that as of the date of the closure of the PITWU Fund in May 2003, there were any claims unpaid by the Fund. Although several individuals testified that they had claims which were not paid, there are no signed enrollment forms in evidence, nor was there testimony presented regarding what the proper amount of payment would have been, or even whether the individual witnesses making claims were eligible to receive benefits.

Notably, the Court specifically asked the Labor Department's representative whether any of the documentation produced by the Secretary in various charts and summaries would indicate to an observer that the Fund was underfunded, and the answer was "no." (Tr. 491.) Indeed, the witness could not establish the number of participants in the Fund, their level of participation, or their required contributions. Therefore, there was no evidence presented to the Court regarding how much money should have been paid by the various employers, or how much PCI/NP should have paid the third party administrators.

Doyle testified that he had a contract to provide a service to an employer which was part of a bona fide collective bargaining agreement, and he forwarded all monies which he was required to present. (Tr. 623-24.) Doyle kept PCMG's consultant fees and profits separate by virtue of "check 2" in an effort not to commingle funds. (Tr. 624.)

Pursuant to Fed. R. Civ. P. 50, the Court may grant a motion for judgment as a matter of law against a party when "a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue."

In response to Holloway's and Doyle's Rule 50 motions, counsel for the Secretary stated:

> Our case is concerned with what happened to all that money after the employers paid it in. A trustee's duty does not begin and end with bringing money into the Fund. As a trustee, Defendant Holloway was also responsible for making sure that the money came back out of the Fund in the right direction; that it was expended prudently for the purpose of paying benefits and not wasted on excess fees and unnecessary expenses.

(Tr. 625.)

18

It is clear that the Secretary is offended by the percentage of employer contributions that were *not* forwarded to medical providers to pay claims. However, the Secretary introduced no evidence that the fees charged were excessive, unreasonable, or contrary to plan documents. In contrast, Doyle testified that PCMG's fees were customary. That testimony was not rebutted. The Court notes that this is not an NLRA case, nor have any claims been alleged pursuant to state insurance law.

As such, after careful consideration, the Court will grant Defendant Holloway's and Defendant Doyle's motions for judgment as a matter of law.

## VI. CONCLUSION

For these reasons, as well as those expressed during the bench trial in this matter, IT IS ORDERED this 30th day of June, 2010 that:

-default judgment is entered in favor of the Secretary of Labor and against Defendant Michael Garnett;

-motions for judgment as a matter of law, pursuant to Fed. R. Civ. P. 50, are hereby granted in favor of Defendants Cynthia Holloway and James Doyle.

/s/ Joseph H. Rodriguez
JOSEPH H. RODRIGUEZ
U.S.D.J.