UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| SECRETARY OF LABOR, | : | Hon. Joseph H. Rodriguez |
| Plaintiff, | : | Civil Action No. 05-cv-2264 |
| v. | : | OPINION |
| JAMES DOYLE, CYNTHIA HOLLOWAY, et al., | : | |
| Defendants. | | |

This matter is before the Court on remand from the United States Court of
Appeals for the Third Circuit pursuant to its Opinion in Secretary of Labor v. Doyle, 675
F.3d 187 (3d Cir. 2012). The case concerns an action by the Secretary of Labor against
James Doyle, Cynthia Holloway, and others, arising from their alleged breach of
fiduciary duties to the Professional Industrial Trade Workers Union (PITWU) Health &
Welfare Fund (Fund), a health benefit plan governed by the Employee Retirement
Income Security Act (ERISA). After a bench trial, this Court entered judgment for Doyle
and Holloway. The Secretary appealed the Court's judgment, arguing that the Court
failed to adequately address the breach of fiduciary duty arguments and to consider
whether the Defendants were responsible for diversion of plan assets held by the
Fund. The Circuit vacated this Court's Opinion and remanded the case for additional
factual findings.

## I. Background

The background of the case was laid out thoroughly in the Circuit's Opinion. It is
repeated here for ease of reference. In April 2005, the Secretary brought this action for
breach of fiduciary duty against Holloway, Doyle, the PITWU Fund, and two other
defendants, Michael Garnett and Mark Maccariella. The Secretary's complaint alleged

1

that PITWU had established a health benefit plan that was a "multi-employer welfare arrangement" (MEWA) governed by ERISA. Two companies, Privileged Care, Inc. (PCI) and NorthPoint PEO (NP), enabled small businesses to obtain health benefits for their employees by enrolling the employees in the Fund, even though the employees never joined the union. Privileged Care Marketing Group (PCMG) marketed this arrangement to small businesses. Businesses that chose to enroll their employees in the Fund were required to make benefit payments to PCMG. PCMG retained a portion of the payments as compensation and remitted the balance to PCI and NP. PCI and NP also retained a portion of the payments as compensation and remitted the remainder to claims administrators established by the Fund. The complaint alleged that these payments were assets of the Fund improperly diverted by PCI, NP, and PCMG and that PCI, NP and PCMG were required by ERISA to use the assets only for the purpose of defraying reasonable plan expenses for the benefit of plan participants. 675 F.3d at 189-90.

The complaint alleged that Garnett and Maccariella at various times owned and operated PCI and NP and were fiduciaries under ERISA because the payments they received from their business clients were assets of the Fund under their control. Garnett and Maccariella allegedly breached their fiduciary duties to the Fund by using assets of the Fund for purposes other than defraying reasonable plan expenses for the benefit of plan participants. The complaint similarly alleged that Doyle had owned and operated PCMG and that he was a fiduciary because he exercised discretionary control over payments that were assets of the Fund. It further alleged that Doyle had breached his fiduciary duties to the Fund by improperly using plan assets for his own benefit. Finally, the complaint alleged that Holloway was a named trustee of the Fund, had breached her fiduciary duties to the Fund, and was liable both directly and as a co-fiduciary for failing

2

to detect and prevent the diversion of Fund assets by Garnett, Maccariella, and Doyle. The complaint sought restitution of losses to the plan, a permanent injunction against any of the defendants serving as a fiduciary or service provider to an ERISA plan, appointment of an independent fiduciary to manage the Fund, an accounting, costs, and other appropriate equitable relief. 675 F.3d at 190.

The case proceeded to a bench trial in October 2009. Solis v. Doyle, No. 05–2264, 2010 WL 2671984, at *3 (D.N.J. June 30, 2010). At the beginning of the trial, Maccariella accepted a consent judgment enjoining him from serving as fiduciary or service provider to an ERISA plan and requiring him to pay $195,317. A default judgment was entered against Garnett at the close of trial because he failed to appear at trial "[d]espite numerous continuances granted at his request." This Court made the following factual findings based on the bench trial. 675 F.3d at 190.

In 2000, David Weinstein established PITWU. Holloway owned and operated Employers Depot, Inc. (EDI), a professional employer organization (PEO) that she had established in 1989.[1] At some point in 2000, she learned of PITWU from a health insurance broker. An attorney, Neil Goldstein, who later became counsel to the Fund, provided Holloway with verification of PITWU's union status. On May 1, 2001, Holloway and three other trustees established the PITWU Fund by an Agreement and Declaration of Trust. The Fund initially had two employer members, EDI and

---

[1] A professional employer organization (PEO) provides human resources and administrative services to business clients—typically small to medium size businesses—and often handles its clients' payroll, workers' compensation, and health and retirement benefits. See generally United States v. Jennings, 599 F.3d 1241, 1245 (11th Cir. 2010); Tri–State Emp't Servs., Inc. v. Mountbatten Sur. Co., Inc., 295 F.3d 256, 263 (2d Cir. 2002). PEOs often arrange with their clients to be considered as co-employers of their clients' employees to facilitate management of human resource functions for their clients.

Employers Consortium, Inc. (ECI). The EDI and ECI employees were enrolled as participants in the Fund. The Trust Agreement obligated EDI and ECI to make regular contributions to the Fund for each of their employees covered by the Fund. The Fund made annual filings with the federal government, had trustees, counsel, an actuary, and claims administrators. Counsel for the Fund never expressed a concern that PITWU was not a valid union or that the Fund was not a valid multi-employer fund. 675 F.3d at 190-91.

In January 2002, ECI terminated its relationship with PITWU. PCI and NP then became employer members of the PITWU Fund. PCI and NP entered into identical collective bargaining agreements (CBA) with PITWU in which they agreed to make contributions to the Fund so that their employees could receive health benefits under the Fund.[2] The CBAs provided that PITWU had "been designated by a majority of employees in certain client companies of [PCI/NP] as their exclusive bargaining representative for those terms and conditions of employment controlled by [PCI/NP] as per its 'client Service Agreement.'" The "client Service Agreement" referred to a PEO Services Contract, which was executed by clients of PCI/NP who wished to obtain health benefits for their employees.[3] Once an employer executed the contract and began making contribution payments, its employees would become members of the PITWU

---

[2] "PCI and [NP] were effectively the same organization in that they shared consultants, office space, owners, and employees." Solis v. Doyle, 2010 WL 2671984, at *4.

[3] PCI/NP's PEO Services Contract contained a co-employment clause stating that PCI or NP "and Client shall be considered co-employers for those employees provided to the Client by [PCI or NP] (designated employees) for . . . purposes" of compliance with certain federal civil rights laws, ERISA, and the Federal Drug Free Workplace Act or any state equivalent.

union and obtain access to health benefits from the Fund. Although the contract allowed clients to choose not to join the PITWU union, clients were required to select the union option to obtain health benefits for their employees through PCI/NP's CBAs with the Fund. Similarly, the contract listed a number of additional PEO services, but the only service consistently offered by PCI/NP was health benefits through the PITWU Fund.[4] 675 F.3d at 191.

After PCI/NP became an employer member of the Fund, Holloway and another trustee appointed Weinstein as a trustee of the Fund. Later in May, Weinstein sold PCI/NP to Garnett, resigned as trustee, and was replaced by Garnett.[5] 675 F.3d at 191.

Doyle's company, PCMG, marketed the services of a variety of entities, including PCI/NP.[6] In January of 2002, Doyle signed a Marketing Service Agreement with PCI, in which PCMG agreed to market PCI's services for a fee. PCMG also collected payments from PCI/NP's clients. Clients made payments by two checks, one to PCI/NP for participation in the Fund (Check 1), and one to PCMG for administrative service fees (Check 2). PCMG received both checks and would forward the first on to PCI/NP. It retained the second check to cover its expenses, which included sales commissions paid to PCMG's sales consultants and fees for additional services selected by the client, such

---

[4] PCI/NP attempted at some point to offer payroll services—payment of employees' checks and payment of payroll taxes—but one business owner that selected this service testified at trial that he discontinued it after several months because PCI/NP had failed to make the necessary tax payments, subjecting the business to significant penalties.

[5] Garnett operated the company until August 2002, when Maccariella took over. Maccariella operated PCI/NP until it ceased operations in March 2003.

[6] PCI/NP did not market its services exclusively through PCMG. For example, Weinstein's wife also brought a number of clients to PCI/NP.

as gap insurance.[7] PCMG also provided monthly reports to PCI/NP regarding funds received and paid certain union dues. 675 F.3d at 191-92.

At some point, PCMG stopped marketing for PCI/NP, but continued to provide billing and administrative services until May 2003. PCMG received $4.5 million in Check 1 funds, and $2.1 million in Check 2 funds.[8] PCMG forwarded $3.1 million of the Check 1 funds to PCI/NP, and paid $645,000 directly to claim administrators and medical providers.[9] In addition to the $3.1 million received from PCMG, PCI/NP also directly received $816,000 from employers enrolled in the Fund through Weinstein's wife. Of this roughly $3.9 million, PCI/NP sent $2.1 million to claims administrators to pay employee health benefit claims. Thus, in total, PCMG and PCI/NP collected $7.4 million in payments relating to the Fund, but only $2.7 million was sent to claim administrators for the payment of health benefit claims. The remaining $4.7 million was retained by PCMG or PCI/NP. 675 F.3d at 192.

The Fund retained a third-party claims administrator to pay health benefit claims by employees covered by the Fund. The Fund's first claims administrator was Union Privileged Care (UPC), which was owned by Weinstein. Oak Tree Administrators (Oak Tree) replaced UPC as claims administrator and served in that capacity from March to

---

[7] Gap insurance is purchased to cover potential gaps in insurance coverage, for example when an employee is between jobs. PCMG made between $20,000 and $33,000 in payments for gap insurance. Solis v. Doyle, 2010 WL 2671984, at *4 n.4.

[8] Doyle testified that PCMG made a net profit of $112,788.13. A substantial portion of the Check 2 monies was used to pay PCMG's sales consultants, who received $1.3 million in total (although not all of this money was related to promotion of PCI/NP).

[9] The record indicates that this $645,000 was sent after November 2002. At that time, PCI/NP stopped making required contributions to the Fund and Doyle was instructed by Fund's trustees to send Check 1 monies directly to claims administrators.

June of 2002.[10] In a meeting with Oak Tree in April 2002, Holloway learned of many

pending claims and of Oak Tree's concern that claims may not have been paid since

November 2001.  The meeting minutes, prepared by Holloway, report that:

> It was discussed that several boxes of unpaid claims had been shipped
> from Union Privilege and that Oak Tree was inputting all the claims to
> determine the magnitude of requirements. It was noted that many claims
> were very old and dated back to mid 2001 with no claims reflecting
> payment since November 2001. Cindy Holloway requested a date for the
> all [sic] claims to be entered into the data base. Oak Tree advised that this
> would be completed by the following Tuesday, April 30.

675 F.3d 192, 197.

In May 2002, Oak Tree reported that it had still not obtained necessary

documents and financial information from UPC and therefore could not provide the

trustees with a financial report; moreover, the Fund's actuary could not perform a study

on the financial condition of the Fund.  Additionally, Oak Tree noted that enrollment

applications submitted by PCI/NP were not complete.  A week after this meeting, in May

2002, Holloway and the other trustees agreed to appoint Weinstein, the owner and

operator of UPC and PCI/NP, as a trustee of the Fund despite "general concerns"

Holloway had about him.[11] 675 F3d 198.

The trustees held another meeting on May 30, 2002. A draft of the minutes from

the meeting prepared by the Fund's attorney indicates that Weinstein resigned at that

---

[10]A claims administrator is an entity that processes employee benefit claims to ensure
that they are legitimate and consistent with plan documents, and then arranges for
payment of valid claims.

[11] Holloway did not investigate Weinstein's qualifications before agreeing to appoint
him. But at some point prior to resigning as trustee, Holloway learned from the Fund's
attorney that Weinstein had been the subject of a cease and desist order from the state
of Florida in connection with an organization called "NAPT." Holloway could not recall
whether she learned this before or after agreeing to appoint him as trustee to the Fund.

meeting and was replaced by Garnett, who succeeded him as owner and operator of PCI/NP. The Fund's accountant informed the trustees that he could not prepare a financial statement for the Fund because certain financial information he had requested from UPC had not yet been provided. The Fund's actuary reported to the trustees that he had received some information from Weinstein but was still missing necessary information about the number of claims for prescription benefits submitted by plan participants and the number of participants enrolled per plan per month. Without this data, he was unable to offer an opinion as to whether the Fund's "reserves were adequate to meet its ongoing needs." Oak Tree also reported that it was awaiting additional information from Weinstein and UPC. Weinstein then joined the trustees' meeting and they developed a list of information that Weinstein would provide; the trustees directed UPC and Oak Tree to provide all necessary data to the Fund's accountant and actuary within two weeks. According to Holloway, the Fund's attorney sent Weinstein a letter after the meeting to confirm the request for information.  675 F.3d 198.

On September 20, 2002, the Fund's new claims administrator, Brokerage Concepts, Inc., informed Holloway of problems relating to lack of funding because of PCI/NP's failure to make contributions to the Fund and other problems arising from inadequate paperwork.[12]  675 F.3d at 192.

These problems were illustrated by the testimony of five business owners who had obtained access to the Fund through PCI/NP. They testified that they had difficulty presenting claims and did not have claims paid to their satisfaction. Additionally,

_____

[12] In December 2002, Southern Plan Administrators replaced Brokerage Concepts, Inc. as claims administrator for the Fund.

several of these witnesses testified that they did not consider their employees unionized or part of the PITWU union. One employer was assured by PITWU union officials that PITWU brought small businesses "under its umbrella for purposes of medical benefits and payroll, but that there was no interest in unionizing the employees." 675 F.3d at 193.

In response to these problems, Holloway asked Goldstein, the Fund's attorney, "to bring some accountability to the Fund, but he asked [Holloway] to talk to the trustees about that." She also asked Goldstein to obtain membership information from PCI.  675 F.3d 193, 198.

On September 27, 2002, Holloway resigned as trustee. She identified several reasons leading to her resignation, including the lack of financial accountability for contributions to the Fund and resulting lack of funding to pay claims. She described the "vulnerability of the Fund due to actions taken by membership that has created insolvency of the Fund." Holloway also noted that several states had issued cease and desist orders "based on the representation by other membership/trustees that PITWU [was] an insurance program."[13]  675 F.3d at 193.  Holloway listed fifteen specific reasons for resigning, which she explained were "examples and are not representative of all the issues related to my resignation." Many of these reasons related to disagreements with other trustees about their approach to Fund management. For example, she strongly disagreed with the other trustees' dismissal of Oak Tree Administrators without consulting her. Her reasons for resigning also included:

e. Lack of continuity or communication by the Union representatives.

_____

[13] The Fund's attorney would draft responses to these orders stating, as Holloway put it, "this is a union-sponsored plan, it is not insurance, you state commissioners don't have jurisdiction over this."

f. No financial accountability for contributions to the Health and Welfare Fund by other membership. Employers Depot [Holloway's company] provided monthly audits and accountability since the inception of the program.

g. Lack of proper follow through to ensure that Union Privilege provided required financial records to the accountants and actuary that determined the financial solvency of the fund.

h. Establishment of two additional plans without the consent of the Trustees.

i. Contribution rates established for two additional plans without the expressed consent of the Trustees or approval by actuary.

j. Vulnerability of the fund due to actions taken by membership that has created insolvency of the fund.

k. The consensual approach by the PITWU to allow staff of certain membership to make decisions, develop programs and direct the outcome of contracts and TPA activity.

l. Cease and desist orders in multiple states based on the representation by other membership/Trustees that PITWU is an insurance program.

m. Legal issues with the Department of Insurance in multiple states due to the representation by other membership that PITWU is an insurance program.

n. Lack of follow through by responsible parties to ensure the structure, insurance programs and related requirements are managed timely and effectively.

Holloway expressed concern about "the chaotic state of affairs of the Fund," which had "brought undue damage in multiple states, created credit damage to the membership due to claims that are in excess of 9 months old and generally has ruined the credibility of the Union and its associated fiduciaries."  675 F.3d 198-99.

Holloway did not seek mediation of disputes with other trustees regarding the management of the Fund or seek to remove any trustee. Nor did she demand an audit of PCI/NP or PCMG or contact the Department of Labor to complain about the lack of funding, lack of financial accountability, or "chaotic state of affairs." Holloway did not

find another person to replace her as trustee before resigning, nor was she immediately replaced.  675 F.3d 193, 199.

Holloway did, however, continue to participate in the administration of the Fund after her resignation. In October 2002, for example, Holloway met with Brokerage Concepts to discuss the Fund's lack of funding. She agreed that contribution rates should be increased. EDI, Holloway's company, used its own funds to satisfy claims by its clients' employees that were not paid by the Fund. Holloway also sought to resolve outstanding claims with health care providers and sought payment of claims from Southern Plan Administrators. 675 F.3d at 193.

This Court concluded that the Secretary had failed to show that Holloway or Doyle breached their fiduciary duties to the Fund.

On appeal, the Circuit found significant the cease and desist orders issued by insurance commissioners of seven states against PCI/NP, PCMG, Doyle, and in some cases, the PITWU Fund and Holloway. The Circuit expressed concern that even though the Fund was properly considered a "multi-employer welfare arrangements" (MEWA) under ERISA, see 29 U.S.C. § 1002(40)(A), subject both to ERISA standards and to state insurance regulation, see id. § 1144(b)(6), PCI/NP and PCMG marketed the Fund as a self-insured union sponsored plan, exempted from state regulation. This connection to the union was reinforced by a form that PCI/NP required its clients to sign entitled "Professional Industrial Trade Workers Union Health & Welfare Fund Plan "B" Disclosure Form," which stated:

> This health & welfare plan is sponsored by the Professional Industrial Trade Workers Union (P.I.T.W.U.). The plan is self-funded and exempt from state regulation, as outlined in the Employment Retirement Income Security Act (ERISA) of 1974. The plan is under the jurisdiction of the United States

> Secretary of Labor. This plan is not regulated by any state
> department of insurance. The plan being self-funded is not
> covered by any state or federal guarantee fund in the event of
> fund insolvency.

PCI/NP and PCMG thus relied on the Fund's relationship with PITWU to

claim that ERISA exempted the Fund, and their marketing of the Fund,

from state regulation. 675 F.3d at 194-95.

In January 2002, less than a month after PCI/NP and PCMG were created, the

Oklahoma Insurance Commissioner entered a cease and desist order against PCI,

PCMG, and two of its marketing affiliates, finding that they were engaging in the

unauthorized sale of insurance and ordering them to cease and desist from any further

sales or marketing of insurance in the state. 675 F.3d at 195.

In June 2002, the Louisiana Insurance Commissioner issued a cease and desist

order based on its finding that PCI and PCMG were selling health insurance without

authorization. The Louisiana Commissioner found that PCI purported to offer PEO

services, including health benefits, to its clients. PCI "allegedly assumes the role of 'co-

employer' to the employees of its client employers" and thereby provided these

employees access to the Fund, pursuant to a CBA between PCI and the Fund. However,

the Commissioner found, inter alia, that

> [T]here is no collective bargaining for wages or improved
> working conditions as in a bona fide union agreement . . . .
> Employees of the employers contracting with PCI . . . do not
> directly join the union, and receive no representation or
> benefit from PITWU other than access to the union
> sponsored health plan. One "employer" from Louisiana who
> contracted with PCI and enrolled in the health and welfare
> fund did not include employees or activate any PEO services
> other than the health benefits.

675 F.3d at 195.

12

The Commissioner concluded that PITWU was a self-insurance plan covering employees of multiple employers and had not acquired the necessary authorization to sell insurance in Louisiana.[14] The Commissioner summarized several of PCI, PCMG, and their affiliates' marketing practices as follows:

> The individuals and entities named above have been involved directly or indirectly in making, issuing, circulating, or causing to be made, issued, or circulated written and oral statements in the form of sales presentations and marketing materials used to solicit potential marketing agents and prospective client employers for PCI by, 1) misrepresenting to the public, and on an official document filed with the Louisiana Department of Insurance, that the PITWU or Privilege Care Employee Health and Welfare Fund is not insurance and therefore exempt from regulation under state laws governing insurance and insurance agents; 2) deceptively claiming that PCI's "health benefit services" have been approved by the Louisiana Department of Insurance; 3) falsely claiming that a [sic] official representative of the Louisiana Department of Insurance had been invited and wanted to attend a "compliance and training" meeting held by PCMG and PCI in Louisiana on May 16, 2002; and 4) falsely claiming that PCI had been licensed by the Louisiana Department of Labor as a PEO doing business in this state; 5) falsely representing that PCMG had not been issued a cease and desist order prior to April 20, 2002; and 6) violating several prohibitory laws of this state.

The Commissioner accordingly ordered PCI, PCMG, the PITWU Fund, Weinstein, Doyle, Garnett, Oak Tree Administrators, and several affiliates to cease and desist from marketing or providing health care services in the state. 675 F.3d at 195-96.

By the time the Fund ceased operations in May 2003, five other states—North Carolina, Texas, Massachusetts, Colorado, and Illinois—had entered similar orders

---

[14] ERISA exempts from state insurance regulation certain self-insured employee health benefit plans maintained by a single employer for its employees or by a union for its members. See 29 U.S.C. §§ 1003(a), 1144(a)-(b). Benefit plans established for employees of multiple employers, however, are not exempted from state regulation. See id. § 1144(b)(6).

against PCI/NP, the PITWU Fund, PCMG, Doyle, and others. Several of these orders were based on hearings before state insurance commissioners at which it emerged that, as in Louisiana, PCI/NP purported to offer PEO services but actually offered almost exclusively health benefits through the Fund by enabling its clients' employees to obtain health benefits from the Fund without union membership. Several of the later cease and desist orders also noted that the Fund had numerous unpaid claims—for example, Colorado's Insurance Commissioner noted that as of December 9, 2002, the Fund had over $7 million in unpaid claims. 675 F.3d at 196.

Indeed, PCI/NP required its clients to sign a disclosure form in which it represented that the PITWU Fund was "exempt from state regulation, as outlined in the Employment Retirement Income Security Act (ERISA) of 1974." At trial, five managers whose businesses contracted with PCI/NP testified that their employees were not unionized. One witness stated that he had been assured by PITWU officials that the union had no interest in unionizing employees—it was merely a means of providing health insurance and other benefits. The business owners also testified to problems resulting from unpaid claims for health benefits from the Fund. Financial data presented by the Secretary supports this testimony, showing that the Fund had $7.6 million in unpaid claims on October 31, 2002. 675 F.3d at 196.

Both Doyle and Holloway were aware of at least some of the cease and desist orders. Doyle had contact with insurance commissioners in some states and participated in some of the related proceedings.[15] He is named in each of the orders, and in several

---

[15] The Louisiana Insurance Commissioner noted that Doyle had falsely represented in filings before the Commission that PCMG had not been "subject to regulatory action including cease and desist orders, revocations of license, or similar

cases the record contains certified mail slips confirming that he or PCMG received copies of the orders.[16] Holloway also learned of some of the cease and desist orders while serving as trustee, mentioning them in her resignation letter as one of her reasons for resigning. But the extent of her knowledge about the orders is unclear, and the orders with the most troubling findings were issued after her resignation. In addition, the Fund's attorney assured Holloway that he would respond to these orders, arguing that "this is a union-sponsored plan, it is not insurance, you state commissioners don't have jurisdiction over this." 675 F.3d at 196-97.

The Circuit found it significant that PCI/NP's promotion of the Fund was similar to the type of "scheme" that ERISA's MEWA provisions were specifically designed to prevent: an aggressively marketed, but inadequately funded health benefit plan masquerading as an ERISA-exempt plan in order to evade the solvency controls imposed by state insurance regulation.[17] "Although the record is not entirely clear on

---

actions," even though PCMG had received a cease and desist order from the Oklahoma Insurance Commission only two months before filing its application.

[16] Although not clearly related to this case, on October 27, 2007, Doyle pleaded guilty to a felony violation of Texas laws against selling unauthorized insurance, was sentenced to five years of community supervision, and agreed to pay $380,788.39 in restitution to unspecified victims. The indictment to which Doyle pleaded guilty is not included in the record, however, and the judgment of conviction states that the offense was committed on February 1, 2001, several months before the Fund was created and nearly a year before PCMG began marketing for PCI/NP.

[17] The Circuit cites the Legislative Hearing on Pension Issues, Hearing on Hr. 1641, H.R. 3632, H.R. 6462 Before the Subcomm. on Labor–Management Relations of the H Comm. on Education and Labor, 97th Cong. 1–2 (1982) (statement of Rep. Burton explaining that MEWA amendments were made to prevent "fraudulent" insurance trusts from using ERISA preemption to sell health insurance to small businesses without "comply[ing] with the basic solvency controls which each State establishes to protect health care consumers").

this point, it appears that the ultimate result of this arrangement was that which Congress feared: the Fund was ultimately unable to pay all employee claims, and thus employees participating in the Fund were not provided promised health benefits. Doyle and Holloway were not the principal architects of this scheme, and the question presented by this case is the extent of their awareness of the scheme and liability for its consequences." 675 F.3d at 197.

The Circuit found that this Court erred in failing to determine whether payments collected by PCI/NP and PCMG were plan assets subject to ERISA.[18]  The Circuit ordered this Court to "make detailed factual findings concerning the nature of the funds received and controlled by Doyle to determine which, if any of these funds, were plan assets. The court should specifically address whether Check 1 and Check 2 monies were 'plan assets,' considering in particular those monies sent at the direction of the trustees directly to claims administrators. If the District Court determines on remand that some or all of these monies are 'plan assets,' it should then consider whether Doyle had sufficient control over these assets to support a finding of fiduciary status. If the District Court finds that Doyle is a fiduciary with respect to certain plan assets, it should then consider whether Doyle breached his fiduciary duties to the Fund." 675 F.3d at 201

---

[18] "The identification of plan assets in this case determines ERISA's reach. If, as the Secretary claims, all of the money collected from employers by PCI/NP and PCMG were plan assets from the moment of collection, then Doyle may be a fiduciary by virtue of exercising control over those assets, see 29 U.S.C. § 1002(21)(A)(i), and, if he is a fiduciary, he and Holloway may be liable for breaching their fiduciary duties with respect to those assets. See 29 U.S.C. §§ 1104(a), 1105(a), 1109(a). But if, as Doyle and Holloway claim, the payments collected by PCI/NP and PCMG were not plan assets, and the only assets of the Fund were those payments received by the Fund's claims administrators, then Doyle did not handle any plan assets, and could not be a fiduciary under ERISA, and Holloway's duties as a fiduciary were not implicated by PCI/NP's and PCMG's disposition of the payments they collected from employers." 675 F.3d at 200.

(citations omitted). Further, "[i]f on remand the District Court finds that any of the monies retained by PCMG or PCI/NP were plan assets, it should then consider whether Holloway breached her fiduciary duties relating to those assets and is liable for any resulting losses to the plan." Id. at 203. In doing so, the Court must "address whether Holloway had a duty to investigate, how extensive an investigation would have been required, or whether an adequate investigation would have revealed the Fund's potential insolvency and/or the diversion of assets." Id. at 202.[19]

## II. Discussion

### A. Determination of Plan Assets

ERISA does not define the term "plan assets."  The statute provides, in relevant part, that plan assets are "plan assets as defined by such regulations as the Secretary may prescribe."  29 U.S.C. § 1002(42).  The regulations address the scope of "plan assets" in two specific contexts: (1) where an employee benefit plan invests in another entity, 29 C.F.R. § 2510.3–101, and (2) where contributions to a plan are withheld by an employer from employees' wages, 29 C.F.R. § 2510.3–102.  Secretary of Labor v. Doyle, 675 F.3d at 203.  Neither of those descriptions is applicable here.  However, "[t]he Secretary of Labor has repeatedly defined 'plan assets' consistently with 'ordinary notions of property rights,' including in the definition any funds in which a plan has obtained a 'beneficial interest.'"  Kalda v. Sioux Valley Physician Partners, Inc., 481 F.3d 639, 647 (8th Cir. 2007) (finding that "[w]hether a plan has acquired a beneficial interest in particular funds depends on whether the plan sponsor expresses an intent to grant such a beneficial interest or has acted or made representations sufficient to lead

---

[19] "[A] trustee has a duty to maintain financial records and to preserve and protect the assets of the plan, including from diversion or embezzlement."  Id.

participants and beneficiaries of the plan to reasonably believe that such fund separately secure the promised benefits or are otherwise plan assets"). The Supreme Court has endorsed the Secretary's position that "in situations not covered by the plan asset regulations, 'the assets of a plan generally are to be identified on the basis of ordinary notions of property rights under non-ERISA law.'" See Jackson v. United States, 555 U.S. 1163 (2009), which adopted the position asserted by the Solicitor General in his brief for the United States, 2009 WL 133443, at *11-*12 (citing DOL Advisory Op. No. 93-14A (May 5, 1993) (AO); see AO No. 2005-08A (May 11, 2005); AO No. 94-31A (Sept. 9, 1994); AO No. 92-22A (Oct. 27, 1992)). The assets of a welfare plan thus "include any property, tangible or intangible, in which the plan has a beneficial ownership interest." Secretary of Labor v. Doyle, 675 F.3d at 203 (quoting DOL Advisory Op. No. 93-14A, 1993 WL 188473, at *4 (May 5, 1993)).

"As a general rule, the first step in identifying the property of an ERISA plan is to consult the documents establishing and governing the plan." Secretary of Labor v. Doyle, 675 F.3d at 204. In light of these documents, a court should then "consult contracts to which the plan is a party or other documents establishing the rights of the plan." Id. (citations omitted). Representations made to a business that purchased benefits are relevant only to the extent that they affect property rights under ordinary property law principles. Id.

The governing documents and related contracts in this case include the Declaration of Trust establishing the PITWU Health and Welfare Fund, P-1, and the forms which each employer executed to adopt the Fund, and the instructions for completing those forms, P-12, P-13, P-14, P-22, P-23. Although the Declaration of Trust references CBAs, the Circuit has cautioned: "The record shows that the CBAs between

18

PITWU and PCI/NorthPoint were bogus—they were not the result of bona fide collective bargaining, and the employees it enrolled in the union by PCI/NorthPoint were not genuine union members—but no similar evidence was presented concerning the CBAs between PITWU and its other employer members, ECI and EDI." 675 F.3d at 197 n.23. Further, employers that participated in the Fund were not given copies of the CBAs. Tr. 31:20-25, 49:23-24, 101:10-15, 294:23-25.  As such, the CBAs cannot form the basis for defining plan assets.  Instead, as discussed below, employers "agreed in writing" to participate in the Fund by executing a packet of forms, and by submitting checks in response to invoices they received. These latter documents, and not the CBAs, will be read in conjunction with the Declaration of Trust to determine the assets of the Fund.

   The Declaration of Trust provided:

   There is hereby established a Trust Fund into which shall be paid on or
   after May 1, 2001 any and all contributions payable by EMPLOYERS or
   any other eligible EMPLOYER who has agreed, in writing, to be bound by
   the terms of this Agreement.

P-1 at p. 2, ¶1. Thus, the Declaration of Trust created the Fund and identified the Fund's assets as "any and all contributions payable by EMPLOYERS." The Declaration of Trust itself does not, however, specify who these employers were, or what their contributions were to be; instead it referenced related documents in which the employers "agreed in writing" to be bound by the terms of the Declaration of Trust.

   The related documents consisted of a packet of forms, signed by the employer, which reflected his intent to participate in the Fund and the rate he would pay for benefits. P-12, P-13, P-14, P-22, P-23; Tr. 68:12-69:2. By checking the "health benefit" box and the "union" box on the form titled "Client Services Agreement," the employer agreed in writing to participate in the Fund. Tr. 66:6-14, 68:3-6, 198:14-22, 205:6-10; P-

19

12, P-13, P-139 at 36:5-16. Although the "Client Services Agreement" did not identify the Fund by name, another page of the form stated that "[t]his health and welfare plan is sponsored by the Professional Industrial Trade Workers Union (P.I.T.W.U.);" the employer executed this page as well. P-22 at 7; P-23 at 7; P-14 (referencing "Disclosure Form"); Tr. 70:13-20.

Another page of the form packet, the "New Business Turn-in Form," stated the monthly contributions per employee that the employer was obligated to tender in order to maintain health coverage for those employees. P-22 at 1 (under column "PEO Amount" and "Total Amount"). The employer executed this page as well. Tr. 68:24-69:4, 69:21-70:8; P-22. The contributions per employee listed on the New Business Turn-in Form set forth a "lump-sum" of per-employee monthly contribution, at three different rates depending on whether the coverage was for the employee only ($334), employee plus one dependent ($560) or employee plus family ($714). P-22 at 1; Tr. 74:11-25.

The employer was required to submit a check for the total contribution amount with this packet of forms. P-14 ("Collect a check for the first month's premium").

Defendant Doyle testified:

Q. Okay. Was there any check which typically accompanied this package of forms?

A. In most cases there would have been a check or checks.

Q. Okay. And when you say there would have been a check, looking at the first page of the form again, I know this is an example, is there a line on the first page of the form that would reflect how much that initial check would be?

A. "Total check amount."

Q. Okay. Now, for total check amount, we're looking about two-thirds of the way down the form, there is a line labeled "total check amount." On

20

that line on this particular form I see 1,858. Is that correct, is that the number you are referring to?

A. That is correct.

Tr. 70:25-71:13. See also P-23 at 2 (photocopy of check with packet of forms; check amount equals "total amount" listed on P-23 at 1.) From the employers' point of view, the combined amount was the cost of the insurance for each of his employees. Tr. 73:11-25, 28:21-29:3, 43:19-44:1, 44:23-45:11, 48:2-5, 103:15-104:7, 296:3-15; P-139 at 96:1-98:10. That the cost of procuring health insurance was later broken apart by invoice into two checks does not defeat the conclusion that the employer payments constituted Fund assets within the meaning of ERISA.

The forms signed by the employer to adopt the Fund as a health plan for his employees did not parcel the premium into Fund assets and other monies. P-22, P-23. The only fees broken out were the one-time processing fee and a $10 monthly billing fee. P-22 at 1; P-23 at 1. Neither the Declaration of Trust nor the agreements signed by the employers set forth how much money will be forwarded to claims administrators. Given that the Declaration of Trust directs that "any and all contributions payable by [...] any other eligible EMPLOYER" be paid "into" the Trust Fund, a clear reading of the relevant documents is that the total amount of the employer's contribution is the property of the Fund.

In conclusion, the relevant documents, when read together, establish the Fund's property interest in all of the money which employers forwarded to PCMG ("Check 1" and "Check 2"). The Declaration of Trust created the Fund. The forms which the employer executed established their relationship with the Fund, and showed the payments which they were required to make to participate in the Fund. As such, the

combined amount will be considered plan assets under ordinary notions of property

rights.

## B. Determination of Fiduciary Status and Duties

### i. Fiduciary Status

ERISA defines "fiduciary" not in terms of formal trusteeship, but in functional

terms of control and authority over the plan. Srein v. Frankford Trust Co., 323 F.3d 214,

220 (3d Cir. 2003). Under ERISA, even if a person is not named as a fiduciary in plan

documents, he or she may still be a fiduciary with respect to a plan to the extent:

(i)     he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets,

(ii)    ...

(iii)   he has any discretionary authority or discretionary responsibility in the administration of such plan.

29 U.S.C. § 1002(21)(A) (emphasis added). The statutory definition thus requires that a

fiduciary "must be someone acting in the capacity of manager, administrator, or

financial advisor to a plan." Pegram v. Herdrich, 530 U.S. 211, 222 (2000) (internal

quotations omitted); Board of Trustees of Bricklayers and Allied Craftsmen Local 6 of

N.J. Welfare Fund v. Wettlin Assocs., Inc., 237 F.3d 270, 272 (3d Cir. 2001).

Discretion is a prerequisite to fiduciary status for a person generally managing an

ERISA plan under the first clause of subsection (i) or administrating a plan under

subsection (iii). However, under the second clause of subsection (i), any control over the

disposition of "plan assets" makes the person who has such control a fiduciary. In other

words, for those who manage plan assets, control over such assets—even without

discretion—is sufficient to confer fiduciary status. Bricklayers, 237 F.3d at 273. The

statute recognizes the high standard that trust law imposes on those who handle money

or assets on behalf of another. Id.

ERISA describes a fiduciary's duties to a plan as follows:

a fiduciary shall discharge his duties with respect to a plan in the interest
of the participants and beneficiaries and—
  (A) for the exclusive purpose of:
      (i) providing benefits to participants and their beneficiaries; and
      (ii) defraying the reasonable expenses of administering the plan;
  (B) with the care, skill, prudence and diligence under the circumstances
then prevailing that a prudent man acting in a like capacity and familiar
with such matters would use in the conduct of an enterprise of a like
character and with like aims;
  (C) by diversifying the investments of the plan so as to minimize the risk
of large losses, unless under the circumstances it is clearly prudent not to
do so; and
  (D) in accordance with the documents and instruments governing the
plan insofar as such documents and instruments are consistent with the
provisions of this subchapter and subchapter III of this chapter.

29 U.SC. § 1104(a).

## ii. Duty of Loyalty

The fundamental obligation of a fiduciary in discharging his duties is to act with

an "eye single" to the interest of a plan's participants and beneficiaries. Fisher v.

Philadelphia Electric Co., 994 F.2d 130, 132 (3d Cir. 1993). This rule of loyalty is

designed to deter fiduciaries "from all temptation," and "must be enforced with

'uncompromising rigidity.'" NLRB v. Amax Coal Co., 453 U.S. 322, 329-30 (1981).

The duty of loyalty is spelled out in ERISA section 404(a)(1)(A), which provides

in relevant part:

. . . a fiduciary shall discharge his duties with respect to a plan solely in the
interests of the participants and beneficiaries and—
    (A) for the *exclusive* purpose of:
        (i) providing benefits to participants and their beneficiaries; and
        (ii) defraying *reasonable* expenses of administering the plan.

23

29 U.S.C. § 1104(a)(1)(A) (emphasis added).  That is, the use of plan assets for any

purpose other than (1) to pay benefits; or (2) to pay reasonable expenses that are

necessary to the administration of the plan constitutes a per se breach of the duty of

loyalty. Srein v. Soft Drink Workers Union, Local 812, 93 F.3d 1088, 1097 (2d Cir. 1996)

("[a]n ERISA fiduciary must discharge its duties 'for the exclusive purpose' of providing

benefits to plan participants and their beneficiaries and of defraying reasonable

administrative expenses"); Martin v. Walton, 773 F. Supp. 1524, 1527 (S.D. Fla. 1991)

(ERISA § 404(a)(1)(A) "mandates that the expenditure of plan assets must be

exclusively for providing benefits and defraying reasonable expenses of administering

the plan").

### iii. Duty of Prudence

The duty of prudence is spelled out in ERISA section 404(a)(1)(B), which

provides that a fiduciary must discharge his/her duties

> with the care, skill, prudence, and diligence under the circumstances then
> prevailing that a prudent man acting in like capacity and familiar with
> such matters would use in the conduct of an enterprise of a like character
> and with like aims.

29 U.S.C. § 1104(a)(1)(B).

The prudence standard contained in ERISA incorporates, but makes "more exacting the

requirements of the common law of trusts relating to employee benefit trust funds."

Donovan v. Mazzola, 716 F.2d 1226, 1231 (9th Cir. 1983).

### iv.  Co-fiduciaries

Fiduciaries cannot turn a blind eye to the activities of their co-fiduciaries; they have a duty to monitor. This fundamental principle of the law of trusts is codified in section 405(a) of ERISA, which provides in relevant part as follows:

> In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:
>
>> (1) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach;
>> (2) if, by his failure to comply with [the duty of loyalty or prudence] in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or
>> (3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

See also Leigh v. Engle, 727 F.2d at 135; Free v. Briody, 732 F.2d 1331, 1334-35 (7th Cir. 1984); In re Enron Corp. Sec., Derivative & ERISA Litig., 284 F. Supp. 2d 511, 553 (S.D. Tex. 2003).

By enacting these provisions for co-fiduciary liability, "Congress expressly rejected the defense of the inactive fiduciary." Zanditon v. Feinstein, 7 Emp. Ben. Cas. (BNA) 1896 (D.Mass. 1986). See Mazur v. Gaudet, 826 F. Supp. 188, 190-192 (E.D. La. 1992) (when a fiduciary allow other fiduciaries to embezzle funds, thus breaching his fiduciary duties under § 404(a)(1), the fiduciary is liable under § 405(a)(2) as well); Briody, 732 F.2d at 1336 (a defendant, "having accepted a position as trustee, could not avoid liability by doing nothing").

### iv. Doyle

The Secretary argues that Doyle was a fiduciary because all or part of the payments that PCMG collected from PCI/NP's clients were plan assets and Doyle, as head of PCMG, exercised discretionary control over those assets. Doyle contends that the payments PCMG collected from employers who enrolled their employees in the Fund were not plan assets and that the only plan assets were funds remitted to the Fund's claim administrators pursuant to the collective bargaining agreements between PITWU and PCI/NP.

Having found that all of the monies under Doyle's control were plan assets, the Court finds that Doyle was a fiduciary, as he exercised "discretionary authority or discretionary control . . . respecting management or disposition of [the Fund's] assets." 29 U.S.C. § 1002(21)(A).  His role went beyond that of a service provider; he received all employer contributions and decided how they should be disbursed, including deciding how much money PCMG would take in commissions.  P-24, Tr. 76:14-18.

Individuals who set up the contribution rates and commission schedules that participants have to pay to receive benefits have been held to be functional fiduciaries. Metzler v. Solidarity of Labor Organizations Health & Welfare Fund, No. 95–CV–7247, 1998 WL 477964, at *7 (S.D.N.Y. 1998) ("Because the Court finds that the amount of the employers' contributions paid . . . constitute assets of the Fund and because defendants had set the total sum of the contribution employers had to pay (over and above the coverage rate set by the Fund and the union membership fee set by [the union]) to receive benefits through the Fund, the Court further concludes that defendants are fiduciaries within the meaning of ERISA.")  In fact, the Ninth Circuit has found that an

insurance broker was a fiduciary with respect to a credit union's ERISA plan when broker determined the amount of monthly plan payments made by credit union, deposited those payments into account under his sole control and then, at his own initiative, transferred some of those funds to different account from which he wrote checks to pay credit union employees' claims.  Patelco Credit Union v. Sahni, 262 F.3d 897, 909 (9th Cir. 2001) (defendant deemed to be a fiduciary where, inter alia, he transferred portions of funds to separate account as his "administrative fees").  The Court is persuaded by these cases that have recognized that by designating a portion of contributions as the "coverage rate," and other portions as commissions, fees, union dues, etc., one necessarily exercises control over the management or disposition of plan assets.

Doyle conceded at trial that he set the commissions and billing fees for PCMG and its marketing agents, virtually unilaterally.  He signed all the checks sent out by PCMG and kept close control over the company.  Joint PreTrial Order, II.B, "Additional Facts Which Doyle Stipulates," at 8 ¶ 104.  Significantly, Doyle decided how much money was to be forwarded to PCI/NP, how much was to be forwarded directly to TPAs and medical providers, and how much was to constitute "commissions" and "administrative expenses" for his employees and contracted marketing agents. P-24, Tr. 76:14-18; Tr. 85:3-17; Tr. 87:2 – 88:16; Joint PreTrial Order, II.B, "Additional Facts Which Doyle Stipulates," at 8 ¶ 104. The sales commissions charged by PCMG for each account were not negotiated with PCI/NP, the Union, or the Fund; rather, they were created by Doyle in consultation with his PCMG's contracted sales consultants. P-24, Tr. 558:7-559:9.  Doyle was a functional fiduciary.

27

Doyle's company, PCMG, "received $4.5 million in Check 1 funds, and $2.1 million in Check 2 funds." 675 F.3d at 192. Regarding the $4.5 million in Check 1 monies, $3.1 million was forwarded to PCI/NP and $645,000 was sent directly to the Fund's claim administrator pursuant to instructions from the Fund's trustees after PCI/NP stopped making contributions in November 2002. 2010 WL 2671984, at *4. For the purpose of this litigation, the Secretary stipulates that all of the monies forwarded to claims administrators by PCMG and PCI/NP was used for the payment of legitimate claims and to defray reasonable costs of administering the health plan. Thus, the Secretary does not allege a fiduciary breach with respect to $2.1 million re-forwarded to claims administrators, P-46 at col. 1, rows 4, 9, 14 and 19, or with respect to the $645,000 which PCMG sent directly to claims administrators. Also from the initial $3.1 million, however, PCMG received $196,998.26 back from PCI/NP as "commissions/refunds," P-45 at col. 8 and 9, row 20, and PCI/NP sent $429,310 to the PITWU Union as "union dues," P-44 at col. 1, row 16. Beside the $755,000 of the $4.5 million collected by Doyle that is unaccounted for, 675 F.3d at 200, it appears that the difference of approximately $374,000 came to rest at PCI/NP.

There is no evidence in the record that PCI/NP or PCMG used any of the Fund assets which they retained for the purpose of providing benefits or necessary services. Defendant Doyle therefore breached his duty of loyalty with respect to: 1) the approximately $952,000 total which PCMG retained from Check 1; 2) the $374,000 which PCI/NP retained from Check 1 (because he knew that PCI/NP was not forwarding all of Check 1 to claims administrators); and 3) the $429,310 in "union dues" forwarded on behalf of employees "who were not genuine union members" pursuant to a "bogus" CBA. See 675 F.3d at 197.

With respect to Check 2, the Circuit held that:

> Doyle's unrefuted testimony that the Check 2 funds he collected for
> marketing fees were customary or reasonable does not mean that he did
> not violate any fiduciary duties under ERISA. If Check 2 monies were plan
> assets and Doyle was a fiduciary, he was required to use these monies "for
> the exclusive purposes of providing benefits to participants in the plan and
> their beneficiaries [and] defraying reasonable expenses of administering
> the plan." 29 U.S.C. § 1104(a)(1)(A). The Check 2 monies retained by
> PCMG were used to pay expenses it incurred in marketing the Fund. It is
> far from obvious how plan participants benefitted from PCMG's marketing
> of the Fund to other businesses with whom they had no connection or why
> the Fund would reasonably incur such expenses. Moreover, as we have
> explained above, the "PEO services" of PCI/NP that PCMG was promoting
> were actually part of a scheme to abuse ERISA preemption and avoid state
> insurance regulations through a sham collective bargaining relationship
> with PITWU. At a minimum, expenditures for marketing this illegal
> scheme were not reasonable expenses for the benefit of plan participants.

675 F.3d at 201.

Given this Court's determination that the Check 2 monies were plan assets and
the Third Circuit's holding that Check 2 was used to pay marketing fees but
"expenditures for marketing this illegal scheme were not reasonable expenses," id., this
Court finds that Doyle breached the duty of loyalty by diverting Fund assets to PCI/NP,
an entity that served no discernable purpose with regard to the Plan.

In addition, courts have held that payment of excessive fees and administrative
expenses, potentially jeopardizing the solvency of the plan, constitutes a breach of the
duty of prudence. See Whitfield v. Tomasso, 682 F. Supp. 1287, 1298-99 (E.D.N.Y.
1988) (administrative expenses for all expenditures other than the payment of benefits
of union-sponsored welfare plan should have amounted to no more than ten percent of
the plan's income); Brock v. Crapanzano, Civ. A. No. 84–1899, 1986 WL 15752 (S.D. Fla.
July 23, 1986) (fees in excess of fifteen percent of plan income were excessive). Donovan
v. Bierwith, 680 F.2d 263, 272 n.8 (2d Cir. 1982). In this case, the portion of plan assets

that PCMG and PCI/NP used for purposes *other* than the payment of legitimate claims or necessary plan expenses is a diversion of over 60% of the assets.  Doyle should have been aware that PCI/NP provided no legitimate service, but he nonetheless forwarded $3.3 million to that organization. In so doing, Defendant Doyle was cognizant that a portion of this money would in turn be used to pay "bogus" dues to a union, and that a portion would go toward paying for PCI/NP's salaries and business expenses. Tr. 64:10-15, 71:24-72:5, 85:6-22, 88:317, 138:2-12. By permitting such diversion of over 60% of the Plan's assets as payments for sales commissions, service fees, administrative charges, and union dues — not including the administrative expenses which the legitimate TPAs charged for claims processing, Doyle breached his duty of prudence.

### v. Holloway

It is undisputed that, as a trustee, Holloway was a named fiduciary, and thus was obligated to discharge her duties to the Fund "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B). The Secretary argues that Holloway failed to act prudently to prevent the improper diversion of Check 1 and Check 2 monies by PCI/NP and PCMG.

A trustee has a duty to maintain financial records and to preserve and protect the assets of the plan, including from diversion or embezzlement. See Restatement (Third) of Trusts §§ 76(2)(b), 83; Ream v. Frey, 107 F.3d 147, 156 (3d Cir. 1997). See, e.g., Russo v. Unger, 845 F. Supp. 124, 128-129 (S.D.N.Y. 1994) (fiduciary's failure to protect the participants by turning a blind eye to her cofiduciary's action constitutes "gross delinquency," despite lack of willfulness or actual knowledge on her part).  In addition, a

trustee must also take prudent precautions, such as by providing for a "suitable and trustworthy replacement," to ensure that his resignation does not harm the Fund or its beneficiaries. See Ream v. Frey, 107 F.3d at 154. Finally, when confronted with suspicious circumstances, a trustee may be required to investigate potential risks to a plan. See Chao v. Merino, 452 F.3d 174 (2d Cir. 2006).

Holloway's inaction (both before and after her resignation) constitutes a breach of her duty of prudence under §404(a)(1)(B). The first paragraph of the Trust Agreement she signed refers to a collective bargaining agreement between the PITWU Union and various PEOs whose stated purpose was to "govern the hours of work, wages and working conditions" of those PEOs' employees. P-1, p. 1. Holloway knew that the Union performed no representation or collective bargaining function apart from collecting dues. Tr. 383:17 – 384:15. Indeed, the collective bargaining agreements referred to in the Trust Agreement—i.e. the document "govern[ing] the hours of work, wages and working conditions"—simply incorporated the employers' existing work hours, holidays, vacation policy, sick leave and wage rates by reference. Tr. 50:24 – Tr. 51:1; Tr. 192:4-12; Tr. 193:1-13; 193:17-23; 197:6-9; Tr. 295:3-13. Holloway knew or should have known the facts upon which the Circuit based its conclusion that the CBAs "were not the result of bona fide collective bargaining." 675 F.3d at 197.

During her trusteeship, several states issued cease and desist orders negatively reflecting the legitimacy of the Union and the legality of the plan. 675 F.3d at 195-197. At least one of the cease and desist orders contained an express finding that the PITWU Union was not a bona fide labor union. 675 F.3d at 195. In response, Holloway forwarded the orders to Neil Goldstein, who would then write a letter to the state

insurance commissioners explaining that they lacked jurisdiction over the matter because PITWU was a "union-sponsored plan." 675 F.3d at 197.

Additionally, Holloway breached her duty of prudence by ignoring evidence that the Fund was being mismanaged. From nearly the inception of her trusteeship, Holloway was aware that: there were "boxes" of claims that had not been processed; that there were large numbers of unpaid health claims; financial reports could not be prepared because of the lack of financial data; the TPA reported insufficient funding to pay adjudicated and valid claims; and a number of states had issued cease and desist orders forbidding the PITWU Fund from operating within their borders, three of which named her as a party.  675 F.3d at 195-198.

In response, Holloway did not do enough. Although she took several steps to rectify recordkeeping problems, she had a duty to more fully investigate, which would have revealed the Fund's potential insolvency and/or the diversion of assets.  Faced with evidence of mismanagement and the inexplicable lack of financial data from her co-fiduciaries, Holloway did not ask for the financial records of PCI/NP and PCMG to try to find out how much of the employer contributions PCMG was keeping as sales commissions, how much the PITWU Union was taking in dues, or how much PCI/NP was paying to itself as salaries and business expenses. Tr. 394:10-23. If she had reviewed PCMG's and PCI/NP's bank records for the months of January through August 2002, she would have learned that PCMG received a total of $4.48 million from participating employers during that time period, and that only $1.3 million of that money was paid to third party administrators and benefit claims. P-46, rows 1-10.[20]

_____

[20] Row 1, Column 3 + Row 6, Column 3 show that a total of $4.48 million was received; Row 4, Column 1 and Row 9, Column 1 show that a total of $1.3 million was the "Total

Further, Holloway was empowered by both the Fund's Declaration of Trust and ERISA to investigate and remediate the problems she later described as a "chaotic state of affairs." The Declaration of Trust required the named trustees to retain an impartial, competent public accountant to audit the Trust Fund and to make available a statement of the audit for review by any interested party. P-1 at p. 4, ¶6. Pursuant to the Declaration of Trust, named trustees could also demand the appointment of an independent arbitrator in the event of a dispute regarding the administration of the Trust. Tr. 387:14-20; P-1 at p. 4, ¶5. Holloway did not compel an accounting or invoke the mandatory arbitration clause in the Trust Declaration. Tr. 387:21-24; 391:1-7.

If those efforts failed, it was Holloway's duty to sue her co-trustees. The Declaration of Trust authorized each named trustee to sue any party to recover money belonging to the Trust. Tr. 386:5-7; P-1 at p. 6, ¶9(e). Indeed, ERISA specifically grants trustees the power to sue their co-trustees or any other entity for appropriate equitable relief on behalf of the Fund. See ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3). Holloway did not commence litigation against the other three defendants to demand an accounting. Tr. 386:8 – 387:13; Tr. 397:1-7.  Nor did she advise the relevant government authorities, i.e., the Employee Benefit Security Administration of the U.S. Department of Labor. Tr. 387:25 – 388:3; P-1, p. 4.

---

Paid TPAs & Benefits." Mar. 19, 2007 Seigert Decl., p. 18-21 (setting forth the underlying documents for P-46 (Summary Chart 8); primary sources include bank account statements for PCMG's accounts and for the third party administrators' accounts).

Holloway's failure to take these steps allowed PCMG and PCI/NP to divert over $3 million during her trusteeship, in violation of ERISA section 405(a)(2).[21]

Rather, Holloway resigned.  But as the Third Circuit has concluded, an ERISA fiduciary's obligations to a plan are extinguished only when adequate provision has been made for the continued prudent management of plan assets. Glaziers and Glassworkers Union Local No. 252 Annuity Fund v. Newbridge Sec., Inc., 93 F.3d 1171, 1138 (3d Cir. 1996). Accord Ream v. Frey, 107 F.3d 147, 155 (3d Cir. 1997).  Holloway expressed concern about "the chaotic state of affairs of the Fund," which had "brought undue damage in multiple states, created credit damage to the membership due to claims that are in excess of 9 months old and generally has ruined the credibility of the Union and its associated fiduciaries." However, Holloway did not find another person to replace her as trustee before resigning, nor was she immediately replaced with a "suitable and trustworthy" person. 675 F.3d at 198-199. Moreover, her resignation and failure to monitor the diversions by PCI/NP and PCMG in violation of her duty under section 405(a)(2) and (3) did not prevent those entities from diverting an additional $1.7 million after her resignation.  Thus, Holloway is not only liable for the diversions which occurred during her trusteeship, but for the losses which occurred *after* her resignation which were enabled by her inaction.

The Secretary argues that Holloway is both directly liable for losses to the plan under ERISA § 409, 29 U.S.C. § 1109, and liable as co-fiduciary under ERISA § 405(a), 29 U.S.C. § 1105(a). As a named trustee, Holloway cannot evade liability by

---

[21] Section 405(a)(2) provides that a fiduciary is liable for a breach by her cofiduciary where her failure to discharge her duty of prudence under § 404(a)(1)(B) has enabled the cofiduciary's breach.

ignoring the obvious signs of mismanagement and diversions by her co-fiduciaries; rather, she owed a duty of undivided loyalty to the plan. See Fisher v. Phila. Elec. Co., 994 F.2d 130, 132 (3d Cir. 1992).  While it is true that a trustee does not have the responsibility to affirmatively monitor day-to-day operations, see Arakelian v. Nat'l Western Life Ins. Co., 755 F. Supp. 1080, 1084 n. 3 (D.D.C. 1990), she cannot ignore the kind of information that was being presented to her and simply walk away.  See Chao v. Merino, 452 F.3d 174, 184 (2d Cir. 2006) ("Knowing – and having expressed the viewpoint more than once – that the [plan administrator] could not be trusted, [defendant] did not exercise reasonable care when she simply proceeded to trust him").  As Holloway is a named trustee, she faces full liability for all breaches by her co-defendants which occurred after the effective date of her trusteeship.  Her lack of prudence enabled others to commit a breach, of which she had knowledge, and she did not make reasonable efforts to remedy that breach.

## III. Conclusion

ERISA section 409(a) provides that "a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this title shall be personally liable to make good to such plan any losses to the plan resulting from each such breach . . . ." Struble v. New Jersey Brewery Employees Welfare Benefit Fund, 732 F.2d 323, 332 (3d Cir. 1984). Where several fiduciaries are involved in ERISA-violative conduct, the liability is joint and several. Davidson v. Cook, 567 F. Supp. 225, 240 (E.D. Va. 1983); Freund v. Marshall & Ilsley Bank, 485 F. Supp. 629, 644 (W.D. Wis. 1979).  Further, ERISA section 409(a) specifies that "[a]ny person who is a fiduciary with respect to a plan who breaches any of [his] duties shall be subject to such

other equitable or remedial relief as the court may deem appropriate, including removal

of such fiduciary." 29 U.S.C. § 1109(a).

In fashioning a remedy, this Court is mindful of the Circuit's Opinion:

> We find it significant that PCI/NP's promotion of the Fund bears striking similarities to the type of scheme that ERISA's MEWA provisions were specifically designed to prevent: an aggressively marketed, but inadequately funded health benefit plan masquerading as an ERISA-exempt plan in order to evade the solvency controls imposed by state insurance regulation. Although the record is not entirely clear on this point, it appears that the ultimate result of this arrangement was that which Congress feared: the Fund was ultimately unable to pay all employee claims, and thus employees participating in the Fund were not provided promised health benefits. . . . [W]e think it is important to keep the nature of the scheme firmly in mind.

675 F.3d at 197.

(1) For the reasons set forth above, Defendant Holloway is jointly and severally liable along with the other defendants to restore and make restitution to the Fund in the amount of $4,698,871.98, plus prejudgment interest, which represents the difference between the money that employers paid in for benefits and the money that was paid out to claims administrators to administer and pay benefits – plan assets diverted from the Fund.

(2) Defendant Doyle is jointly and severally liable along with the other defendants to restore and make restitution to the Fund in the lesser included amount of $3,882,867.98, plus prejudgment interest. The difference is the amount of money received by PCI/NP from employers who were not recruited through PCMG; accordingly, none of this money passed through PCMG. P-47a, col. 23, row 17; Tr. 209:17 – 210:4.

(3) The restored losses to the Plan are subject to computation of prejudgment interest by the Secretary to the date of judgment in this case at the § 6621 IRS underpayment rate.

(4) Defendants are to be enjoined from serving as fiduciaries or service providers for any ERISA-covered employee benefit plan.

(5) An independent fiduciary shall be appointed to supervise the distribution of assets and termination of the Fund.

The Secretary should submit a proposed form of Judgment for the Court's consideration.

Dated: November 28, 2014                    /s/ Joseph H. Rodriguez
                                            JOSEPH H. RODRIGUEZ
                                                    U.S.D.J.