# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| SECRETARY OF LABOR, | : | Hon. Joseph H. Rodriguez |
| Plaintiff, | : | Civil Action No. 05-cv-2264 |
| v. | : | **OPINION** |
| JAMES DOYLE, CYNTHIA HOLLOWAY, et al., | : | |
| Defendants. | : | |

This case concerns violations of the Employee Retirement Income Security Act ("ERISA") by Defendants the Professional Industrial & Trade Workers Union ("PITWU") Health and Welfare Fund (the "Fund"), and four individuals—James Doyle ("Doyle"), Cynthia Holloway ("Holloway"), Michael Garnett, and Mark Maccariella. In 2014, this Court found, *inter alia*, that Defendant Holloway breached her fiduciary duties of loyalty and prudence to the PITWU Fund; and that Holloway was, therefore, jointly and severally liable along with the other defendants to restore and make restitution to the Fund.

The matter is presently before the Court on its second remand from the United States Court of Appeals for the Third Circuit pursuant to its Opinion in Sec'y of Labor v. Doyle, 657 F. App'x 117, 122 (3d Cir. 2016) (hereinafter "Doyle IV").[1] On appeal, the

---

[1] The Court initially held a bench trial in this matter, resulting in a judgment for Doyle and Holloway. Solis v. Doyle, No. CIV.A.05-2264, 2010 WL 2671984 (D.N.J. June 30, 2010), vacated sub nom. Sec'y of Labor v. Doyle, 675 F.3d 187 (3d Cir. 2012) (hereinafter "Doyle I"). The Secretary appealed the Court's 2010 judgment. On appeal, the Circuit vacated this Court's Opinion and remanded the case for additional factual findings as to nature of certain funds and the duties of Doyle and Holloway. Sec'y of Labor v. Doyle, 675 F.3d 187, 189 (3d Cir. 2012) (hereinafter "Doyle II"). For reasons stated infra, this Court found both Holloway and Doyle breached their fiduciary duties, and entered judgment against Defendant Doyle for $3,882,867.98, plus prejudgment interest, and against Defendant Holloway for $4,698,871.98, plus prejudgment interest; Doyle and Holloway appealed. Sec'y of Labor v. Doyle, No. 05-CV-2264, 2014 WL 6747882, at (D.N.J. Dec. 1, 2014), aff'd in part, vacated in part, remanded, 657

Third Circuit vacated this Court's 2014 judgment against Defendant Holloway and remanded the case for additional factual findings as to Holloway's knowledge of the mismanagement of the Fund.

I.    <u>Background</u>

This Court, and the Third Circuit, have detailed the factual background of this case in its previous opinions.[2] The Court will not restate herein the robust factual background, but refer to those facts pertinent to this remand.

### A. Factual Background

David Weinstein ("Weinstein") formed PITWU in 2000. At that time, Holloway owned a Professional Employer Organization (PEO), Employers Depot, Inc. ("EDI"). A broker at EDI introduced Holloway to the PITWU. In April 2001, Holloway asked counsel, Neil Goldstein ("Goldstein"), about the legitimacy of PITW Union and its plan to create the Fund; he advised her that the union was legal. On May 1, 2001, Holloway and three other trustees formally established an employee welfare and benefit plan for the PITWU (the Fund) by an Agreement and Declaration of Trust.

The Fund had a number of trustees, including Holloway; an attorney, Goldstein; an actuary, McKeogh; and an accountant, Beckman. Throughout the life of the Fund, there were also three different third-party claims administrators, hired to pay health benefit claims by employees covered by the Fund. The first claims administrator was

---

F. App'x 117 (3d Cir. 2016) (hereinafter "<u>Doyle III</u>"). The Third Circuit subsequently affirmed this Court's finding as to "plan assets" and Defendant Doyle's liability, and vacated the judgement against Holloway.

[2] <u>See</u> <u>Doyle IV</u>, 657 F. App'x 117, 122 (3d Cir. 2016); <u>Doyle II</u>, 675 F.3d 187, 189 (3d Cir. 2012); <u>Doyle I</u>, No. CIV.A.05-2264, 2010 WL 2671984, at *1 (D.N.J. June 30, 2010).

2

Union Privileged Care ("UPC"), which was owned by Weinstein. In March 2002, Oak Tree Administrators ("Oak Tree") replaced UPC and served as the third-party administrator until June of 2002, when Brokerage Concepts, Inc. took over. See Doyle I, 2010 WL 2671984, at *3-4; Doyle III, 2014 WL 6747882, at *2.

EDI and Employer's Consortium, Inc. ("ECI"), were the Fund's initial employer members. EDI and ECI employees were enrolled as participants in the Fund.[3] The Trust Agreement obligated EDI and ECI to make regular contributions to the Fund for each of their covered employees.  [Dkt. No. 374, ("Supp. Trial Transcript") at 170-72]; Doyle III, 2014 WL 6747882, at *2. When ECI terminated its relationship with the Fund in January 2002, two companies, Privileged Care, Inc. ("PCI") and NorthPoint PEO ("NP"), entered into identical collective bargaining agreements ("CBA") with PITWU, in which they agreed to make contributions to the Fund to enable their employees to receive health benefits under the Fund.[4] PCI and NP permitted small businesses to obtain health benefits for their employees by enrolling the employees in the Fund, even though the employees never joined the union.  Doyle III, 2014 WL 6747882 at *1.

PCMG provided marketing and billing services to PCI and NP, signing up employers to purchase health insurance coverage under the Fund. (Compl.¶ 6.) From January 1, 2002 to June 1, 2003, Doyle was the owner of PCMG. (Id.) Clients made payments by two checks, one to PCI/NP for participation in the Fund (Check 1), and one to PCMG for administrative service fees (Check 2). PCMG received both checks and would forward the first on to PCI/NP. It retained the second check to cover its expenses,

---

[3] EDI recommended the Fund as one possibility to its clients seeking group medical coverage.

[4] Both Garnett and Maccariella served as owners of PCI and NP. (Compl.¶¶ 8−9.)

which included sales commissions paid to PCMG's sales consultants and fees for additional services selected by the client, such as gap insurance. PCMG also provided monthly reports to PCI/NP regarding funds received and paid certain union dues. Id.

On April 28, 2005, the Secretary of Labor filed a Complaint pursuant to ERISA, 29 U.S.C. §§ 1132(a)(2) and (5), to obtain relief for alleged violations of the statute by Defendants. (Complaint ¶¶ 5–9.) The Secretary's Complaint alleged that PITWU had established a health benefit plan that was a "multi-employer welfare arrangement" ("MEWA") governed by ERISA. It provided that PCMG retained a portion of payments as compensation and remitted the balance to PCI and NP; and PCI and NP retained a portion of the payments as compensation and remitted the remainder to claims administrators established by the Fund. The complaint alleged that these payments were assets of the Fund improperly diverted by PCI, NP, and PCMG, and that PCI, NP and PCMG were required by ERISA to use the assets only for the purpose of defraying reasonable plan expenses for the benefit of plan participants. Doyle III, 2014 WL 6747882, at *1.

More specifically, over $7.4 million was collected, allegedly constituting assets belonging to the Fund, while less than $2.7 million was used to pay benefits. Doyle I, 2010 WL 2671984, at *2. Most relevant to this Opinion, "the complaint alleged that Holloway was a named trustee of the Fund, had breached her fiduciary duties to the Fund, and was liable both directly and as a co-fiduciary for failing to detect and prevent the diversion of Fund assets by Garnett, Maccariella, and Doyle." [5] Doyle III, 2014 WL 6747882, at *1.

---

[5] The complaint alleged that Michael Garnett and Mark Maccariella breached their fiduciary duties to the Fund by using assets of the Fund for purposes other than defraying reasonable plan

### B. Factual Findings as to Holloway

Considering the limited scope of this case on remand, the Court's factual findings below focus on Defendant Holloway's knowledge, actions, and inaction between April 2002 and May 20o3.

On April 23, 2002, Holloway attended a trustee meeting. At that time, the third-party claims administrator was transitioning from UPC to Oak Tree. (Supp. Trial Tr. 188:22-189:23.) At the meeting, Holloway learned of "boxes" of unpaid claims. (Id. at 190:5-25.) The Administrator, at that time, did not have all of the data to enter the claims into the database, and the status of those claims was unknown. (Id.); see also Doyle IV, 657 Fed. Appx. 117, 128 ("[T]he magnitude of unpaid claims, and whether there was sufficient funding to meet this requirement, was unknown due to lack of data.").

On May 1, 2002, Holloway, despite general concerns, along with another trustee, appointed Weinstein as a trustee of the Fund. (Supp. Trial Tr. 195:5-15). On May 30, 2002, Holloway attended another trustee meeting, at which time she was unaware of any pending Department of Labor ("DOL") investigation. Doyle I, 2010 WL 2671984 *5; (Supp. Trial Tr. 35:3-7.) At this meeting: (1) Weinstein resigned and designated Michael Garnett ("Garnett") his successor; (2) the Fund "affiliated with the International Association of Machinists and Aerospace Workers"; (3) Holloway inquired about the

_____

expenses for the benefit of plan participants. At the start of this Court's initial Bench Trial, Mark Maccariella accepted a consent judgment requiring him to pay $195,317, and default judgment was entered against Michael Garnett at the close of the trial because he failed to appear "[d]espite numerous continuances granted at his request." See Doyle III, , 2014 WL 6747882, at *1-2.

missing information from UPC, and reiterated the need to get it; and (4) the Fund accountant informed Holloway that he could not provide a formal report because he had not received all the information from UPC "and was discussing the need to get that information from Mr. Weinstein." (Supp. Trial Tr. 194-197.) Holloway never saw an audit of the Fund. (Id. at 26:20-24.)[6]

On June 3, 2002, Holloway faxed Goldstein to inform him that, based on her conversations with Oak Tree and the Fund actuary, she was concerned that Weinstein continued to "drag his feet" regarding the Fund's request for information and documents on claims, despite agreeing to provide such data. (Supp. Trial Tr. 208:1-16; Holloway-8.). Holloway's Memo stated that it was "imperative" for Goldstein to "demand" Weinstein's cooperation. (Holloway-8.) According to Holloway, Goldstein advised her to discuss this issue directly with Weinstein and declined further involvement. Goldstein later informed the trustees that he received necessary documents from Weinstein, on June 6, 2002, and that the materials would be forwarded Oak Tree, Beckman, and McKeogh. (Supp. Trial Tr. 209:17-210:5; Goldstein Dep. 16:18-17:3; Holloway-43 at p. 1.)

Shortly thereafter, on or about June 7, 2002, Holloway's co-trustees made a unilateral decision to terminate Goldstein as the Fund's Attorney. (Supp. Trial Tr. at 33:6-17, 34:18-23.) The letter terminating Goldstein read: "Please do not communicate or release any information without our express written consent. This includes but not limited to the pending Department of Labor Investigation." (Id. at 34:24-35:7.) In June

---

[6] On May 30th of 2002, the Fund's then-attorney, Goldstein, also advised the trustees that his office had provided the insurance departments of Texas, Colorado, and Florida with the information they requested. (Supp. Trial Tr. 52:2-7.)

2002, Holloway's co-trustees also decided to terminate Oak Tree as the Administrator without her knowledge or consent. (Id. 37:11-15). Holloway was aware of their unilateral decision to terminate Oak Tree as early as July 2, 2002. (Holloway-9.) She was concerned that Oak tree might sue the Fund pursuant to its contracts with the Fund. (Supp. Trial Tr. 37:16-25.)

On July 8, 2002, Holloway received a fax from one of her co-trustees, Jim Campbell, containing the termination letter sent to Goldstein. While it is not entirely clear if Holloway knew of Goldstein's termination or the DOL investigation on July 2, 2002,  Holloway knew as of July 8, 2002. (Id. 35:12-14.) Holloway did not reach out to the DOL following the news, nor did Holloway inform any participating employers in the Fund about the investigation. (Id. at 36:2-25.) In addition, Holloway never found out why the trustees fired Goldstein.  She disagreed with the decision, but never contacted Goldstein after the termination. (Id.)

To replace Goldstein, the Fund retained Bruce Harrison, Esq. and his law firm, Capehart & Scatchard, P.A., as counsel. (Holloway-32.) Harrison "assumed" the Union was legitimate. (Harrison Dep. 19:24-20:2.) He practices labor and employment law, had some experience with ERISA litigation, and previously represented employers involved in Taft-Hartley funds. (Id. at 9:7-20, 10:1-4.) On June 28, 2002, Harrison advised the Investigator with the United States DOL, Fred Seigert, that he was retained and understood the DOL was conducting some type of "audit" of the Fund. (Harrison Dep. 65:7-12, 65:17-23; Holloway-33.) Harrison advised Holloway in early August that he had not heard from Frank Seigert of the Pension and Welfare Benefits Administration. (Id. at 220:12-17.)

Holloway made efforts to work with Harrison to resolve the dispute regarding Oak Tree's termination. On July 23, 2002, Harrison wrote a letter to Oak Tree. Holloway understood the letter, in part, as a request for Oak Tree's attorney to contact Harrison to resolve "things." (Holloway-34.) Holloway agreed with the course of action because "Oak Tree . . . had all of the information regarding the clams for the fund, and that information needed to move over to the new TPA." (Supp. Trial Tr. 214:8-14, 214:19-215:25.) On August 29, 2002, Harrison sent an email to Holloway regarding settlement with Oak Tree, and requested she and one of the Union Trustees sign the agreement. They executed the document, which Holloway thought was positive. (Id. 221:4-19; Holloway-11 at p. 1.) The Fund agreed to pay Oak Tree a monetary amount in exchange for the transfer of its information and documents to the new Administrator, Brokerage, and Oak Tree agreed it would not take any further legal action. (Supp Trial Tr. 218:5-220:8.)

Harrison's August 29, 2002 email further notified the trustees that ECI filed a complaint in the United States District for the Northern District of Illinois against the Union. Harrison informed the trustees, including Holloway that the state of North Carolina had reached out to the Union requesting certain information. (Id. 222:9-13; Harrison Dep. 32:4-11; Holloway-11 at p. 1.)[7] Holloway believed that Harrison would be

---

[7] In June 2002, the Louisiana Insurance Commissioner issued a cease and desist order based on its finding that PCI and PCMG were selling health insurance without authorization. The Louisiana Commissioner found that PCI purported to offer PEO services, including health benefits, to its clients. PCI "allegedly assumes the role of 'co-employer' to the employees of its client employers" and thereby provided these employees access to the Fund, pursuant to a CBA between PCI and the Fund. See Doyle I.

handling all of these matters on behalf of the Fund. (Supp. Trial Tr. 222:16-22; 222:6-8; Holloway-11 at p. 1.)

On September 10, 2002, Holloway learned from Brokerage Concepts, that Brokerage still had not received files from Oak Tree, as the Fund had failed to pay Oak Tree. (Id. 39:1840:5.) Holloway worked towards getting Oak Tree the payment owed per the Agreement. When payment was finally made, the check was returned for insufficient funds. Holloway never notified the DOL about this situation with Oak Tree, but testified that Harrison was taking care of "any of that correspondence." (Id. at 40:15-25.) She did not tell participating employers or employees that the settlement check to Oak Tree bounced. (Id. at 41:16-20.)

Harrison sent a letter to PCI's employer trustee, Mark Maccariella ("Maccariella"), on September 26, 2002, in which Harrison explains that the trustees have asked him to advise Maccariella that no employer with the Fund, including PCI, should maintain any association with Weinstein or Garnett, or any person with a connection to them. Harrison clarified at his deposition that the trustees were concerned about having a connection to these individuals, and with Maccariella's reliability; thus, the letter put Maccariella on notice and documented the "good faith and diligence of the trustees." (Supp. Trial Tr. 231:14-232:9; Harrison Dep. 54:4-55:1, 103:16-104:14; Holloway-16.) On this same date, September 26, 2002, Holloway contacted Harrison to inform him that the Fund paid Oak Tree with a dishonored check; Oak Tree never received settlement payment. (Supp. Trial Tr. 39:1-5.)

On September 27, 2002, Holloway resigned as trustee. She identified several reasons for her resignation, including the lack of financial accountability for contributions to the Fund and resulting lack of funding to pay claims. She described the

"vulnerability of the Fund due to actions taken by membership that has created insolvency of the Fund." (P-38, p. 1.) Holloway also noted that several states had issued cease and desist orders "based on the representation by other membership/trustees that PITWU [was] an insurance program." (Id.) Holloway listed fifteen specific reasons for resigning, which she explained were "examples and are not representative of all the issues related to my resignation." Many of these reasons related to disagreements with other trustees about their approach to Fund management. For example, she strongly disagreed with the other trustees' dismissal of Oak Tree without consulting her. Her reasons for resigning also included:

> e. Lack of continuity or communication by the Union representatives.

> f. No financial accountability for contributions to the Health and Welfare Fund by other membership. Employers Depot [Holloway's company] provided monthly audits and accountability since the inception of the program.

> g. Lack of proper follow through to ensure that Union Privilege provided required financial records to the accountants and actuary that determined the financial solvency of the fund.

> h. Establishment of two additional plans without the consent of the Trustees.

> i. Contribution rates established for two additional plans without the expressed consent of the Trustees or approval by actuary.

> j. Vulnerability of the fund due to actions taken by membership that has created insolvency of the fund.

> k. The consensual approach by the PITWU to allow staff of certain membership to make decisions, develop programs and direct the outcome of contracts and TPA activity.

> l. Cease and desist orders in multiple states based on the representation by other membership/Trustees that PITWU is an insurance program.

> m. Legal issues with the Department of Insurance in multiple states due to the representation by other membership that PITWU is an insurance program.

n. Lack of follow through by responsible parties to ensure the structure, insurance programs and related requirements are managed timely and effectively.

(Id.)

Holloway expressed concern about "the chaotic state of affairs of the Fund," which had "brought undue damage in multiple states, created credit damage to the membership due to claims that are in excess of 9 months old and generally has ruined the credibility of the Union and its associated fiduciaries." (Id. at p. 2). Holloway did not seek mediation of disputes with other trustees regarding the management of the Fund or seek to remove any trustee. Nor did she demand an audit of PCI/NP or PCMG or contact the Department of Labor to complain about the lack of funding, lack of financial accountability, or "chaotic state of affairs." Holloway did not find another person to replace her as trustee before resigning, nor was she immediately replaced.  Doyle III, 2014 WL 6747882, at *5.

Holloway did, however, continue to participate in the administration of the Fund after her resignation. In October 2002, Holloway met with Brokerage Concepts to discuss the Fund's lack of funding, met with the DOL to answer questions, and sought the DOL's assistance. Notably, Holloway's company, EDI, used its own funds to satisfy claims by its clients' employees that were not paid by the Fund. Holloway also sought to resolve outstanding claims with health care providers and sought payment of claims from Southern Plan Administrators. Id.

**C. Procedural History**

A bench trial was held in this matter, beginning October 19 through October 26, 2009, in which the Court made findings of fact as to Doyle and Holloway. Based on the findings of fact from that trial, this Court concluded that the Secretary failed to show that Holloway or Doyle breached their fiduciary duties to the Fund. Doyle II, 675 F.3d

11

187, 193 (3d Cir. 2012). The Secretary appealed that decision, arguing that the Court failed to adequately address the breach of fiduciary duty arguments and to consider whether the Defendants were responsible for diversion of plan assets held by the Fund. On appeal, the Third Circuit found that this Court erred when it failed to determine whether payments collected by PCI/NP and PCMG were plan assets subject to ERISA.

> The Circuit vacated this Court's 2010 Opinion and directed this Court to
>
> make detailed factual findings concerning the nature of the funds received and controlled by Doyle to determine which, if any of these funds, were plan assets [and specifically address whether Check 1 and Check 2 monies were 'plan assets']. If the District Court determines on remand that some or all of these monies are "plan assets," it should then consider whether Doyle had sufficient control over these assets to support a finding of fiduciary status.

Id. at 201. If the Court found Doyle was a fiduciary with respect to plan assets, the Court was directed to consider "whether Doyle breached his fiduciary duties to the Fund." Id. (citations omitted). The Circuit further held, "[i]f on remand the District Court finds that any of the monies retained by PCMG or PCI/NP were plan assets, it should then consider whether Holloway breached her fiduciary duties relating to those assets and is liable for any resulting losses to the plan." Id. at 203. In doing so, the Court must "address whether Holloway had a duty to investigate, how extensive an investigation would have been required, or whether an adequate investigation would have revealed the Fund's potential insolvency and/or the diversion of assets." Id. at 202.

On remand after the first appeal, this Court explained that employers "agreed in writing" to participate in the Fund by executing a packet of forms, and by submitting checks in response to invoices they received. The Court read these documents, in conjunction with the Declaration of Trust, to determine the assets of the Fund. The

Declaration of Trust created the Fund and identified the Fund's assets as "any and all contributions payable by EMPLOYERS." The related documents consisted of a packet of forms, signed by the employer, which reflected his intent to participate in the Fund and the rate he would pay for benefits. Doyle III, 2014 WL 6747882, at *10-11. As stated by the Third Circuit:

> By Doyle's design, employers originally sent in one single check to enroll in the Fund and get health benefits for their employees, and only after did he divide payments into two checks, ostensibly one for health insurance contributions (Check 1) and one for PEO services (Check 2). Several employers testified that they believed that their payments to PCMG were only for health insurance.

This Court found that the relevant documents, when read together, sufficiently established the Fund's property interest in all of the money which employers forwarded to PCMG ("Check 1" and "Check 2"). Therefore, the Court held these monies were "plan assets." Id.

This Court next addressed whether Doyle maintained a fiduciary status with respect to the plan assets, and found that Doyle was a fiduciary because all or part of the payments that PCMG collected from PCI/NP's clients were plan assets and Doyle, as head of PCMG, exercised discretionary control over those assets. This Court further ruled that Doyle breached his fiduciary duties of loyalty and prudence to the Fund. Id. at *13-16.

Finally, the Court determined that Holloway's inaction (both before and after her resignation) constituted a breach of her fiduciary duty under § 404(a)(1)(B). Specifically, this Court found that Holloway ignored evidence that the Fund was being mismanaged, that her lack of prudence enabled others to commit a breach, and that she failed to make reasonable efforts to remedy that breach. Ultimately, this Court held Holloway liable for

the diversions which occurred during her trusteeship, as well as for the losses which occurred after her resignation, which were enabled by her inaction.

Holloway and Doyle appealed the Court's decision in Doyle III. On that appeal, the Third Circuit found that this Court did not clearly err in: (1) concluding "that all contributions from employers—i.e., both Check 1 and Check 2 monies—were "plan assets" within the meaning of ERISA; or (2) concluding that "Doyle breached his duty of loyalty to the Fund because he knew that these monies were not used to benefit plan participants." 657 F. App'x 117, 125, 127 (3d Cir. 2016). As to Holloway's liability, the Circuit vacated this Court's 2014 Opinion, noting that it disagreed with the Secretary's position, "that Holloway should be liable for all diverted assets because she failed, from the creation of the Fund in January 2001, to create a mechanism for collecting employer contributions and processing benefit claims that would have prevented PCMG and PCI/NP's scheme. . . . As we have explained, Holloway's action or inaction as a trustee must be assessed against when information or red flags became available to her." Id. at 128.

The Circuit noted that Holloway learned of the administrator's concern over "boxes" of potentially unpaid claims in April of 2002 and found that Holloway "reasonably reacted to and addressed the potential problem." Id. It further concluded that "although [this Court] may have properly found that Holloway breached her duty of prudence through inaction during her tenure as trustee, the evidence adduced at trial is insufficient to support a conclusion that Holloway failed to act as a prudent trustee prior to May 30, 2002." Id. at 127. Accordingly, the case was remanded to this Court for additional factual findings "as to when, after May 30, 2002, Holloway knew or should have known that the Fund was being mismanaged or was underfunded." Id. at 129.

14

On March 19th and 20th of 2019, this Court held a supplemental bench trail to address the narrow issue before the Court: at what point after May 30, 2002 should Holloway have known, or know, that the Fund was underfunded or being mismanaged. The Secretary argues that "the evidence adduced at the supplemental trial shows clearly that Holloway knew or should have known that the Plan was mismanaged and underfunded as early as May 30, 2002 and no later than September 20, 2002." [Dkt. No. 381, p. 10 of 32]. Defendant Holloway contends that the Secretary has failed to meet its burden to prove that she breached her fiduciary duties or that she "is liable for any quantifiable amount of damages." [Dkt. No. 371].

## II.   Analysis

In accordance with ERISA, a fiduciary owes a duty of loyalty, to act "for the exclusive purpose of (i) providing benefits to their participants and beneficiaries; and (ii) defraying reasonable expenses of administering the plan." 29 U.S.C. § 1104(a)(1)(A). That is, the use of plan assets for any purpose other than (1) to pay benefits; or (2) to pay reasonable expenses that are necessary to the administration of the plan constitutes a per se breach of the duty of loyalty. Srein v. Soft Drink Workers Union, Local 812, 93 F.3d 1088, 1097 (2d Cir. 1996); Martin v. Walton, 773 F. Supp. 1524, 1527 (S.D. Fla. 1991) (ERISA § 404(a)(1)(A)) "mandates that the expenditure of plan assets must be exclusively for providing benefits and defraying reasonable expenses of administering the plan"). The fundamental obligation of a fiduciary in discharging his duties is to act with an "eye single" to the interest of a plan's participants and beneficiaries. Fisher v. Philadelphia Electric Co., 994 F.2d 130, 132 (3d Cir. 1993). This rule of loyalty is designed to deter fiduciaries "from all temptation," and "must be enforced with

'uncompromising rigidity.' " NLRB v. Amax Coal Co., 453 U.S. 322, 329–30, 101 S. Ct. 2789, 69 L. Ed. 2d 672 (1981).

A fiduciary also owes a duty of prudence, to act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B); Doyle II, 2014 WL 6747882, at *16. ERISA's prudence standard incorporates, but makes "more exacting the requirements of the common law of trusts relating to employee benefit trust funds." Donovan v. Mazzola, 716 F.2d 1226, 1231 (9th Cir. 1983).

Finally, fiduciaries cannot turn a blind eye to the activities of their co-fiduciaries; they have a duty to monitor. This fundamental principle of the law of trusts is codified in section 405(a) of ERISA, which provides in relevant part as follows:

> In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:
>
> > (1) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach;
> >
> > (2) if, by his failure to comply with [the duty of loyalty or prudence] in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or
> >
> > (3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

See also <u>Leigh v. Engle</u>, 727 F.2d at 135; <u>Free v. Briody</u>, 732 F.2d 1331, 1334-35 (7th Cir. 1984); <u>In re Enron Corp. Sec., Derivative & ERISA Litig.</u>, 284 F. Supp. 2d 511, 553 (S.D. Tex. 2003).

By enacting these provisions for co-fiduciary liability, "Congress expressly rejected the defense of the inactive fiduciary." <u>Zanditon v. Feinstein</u>, 7 Emp. Ben. Cas. (BNA) 1896 (D. Mass. 1986). <u>See</u> <u>Mazur v. Gaudet</u>, 826 F. Supp. 188, 190-192 (E.D. La. 1992) (when a fiduciary allow other fiduciaries to embezzle funds, thus breaching his fiduciary duties under § 404(a)(1), the fiduciary is liable under § 405(a)(2) as well); <u>Briody</u>, 732 F.2d at 1336 (a defendant, "having accepted a position as trustee, could not avoid liability by doing nothing").

### A. Holloway's Liability

As previously established, it is undisputed that Holloway was a Fund trustee and moreover, a fiduciary who owed both a duty loyalty and prudence to the Fund. It is also well-established that Holloway was <u>not</u> the "principal architect" of the scheme following PCI/NP's promotion of the Fund. <u>Doyle II</u>, 675 F.3d 187, 197 (3d Cir. 2012). In fact, the Secretary has failed to produce evidence that Holloway knew, specifically, that plan assets were diverted to PCMG and PCI/NP as payments for sales commissions, service fees, administrative charges, and union dues, prior to the commencement of this lawsuit. The Court finds, however, that by Holloway's own admissions, she was aware that the Fund was mismanaged and underfunded by the time she resigned as trustee.

As stated by the Circuit, Holloway's action or inaction as a trustee must be assessed against when the information or red flags of such mismanagement and underfunding became available to her. <u>Doyle IV</u>, 657 F. App'x 117, 129 (3d Cir. 2016).

"[T]he evidence adduced at trial [wa]s insufficient to support a conclusion that Holloway failed to act as a prudent trustee prior to May 30, 2002." Id. at 127 (emphasis added). Thus, at this juncture, the Court considers the "extent of Holloway's liability after May 30, 2002, considering when Holloway became aware of red flags related to diverted participant contributions." Id.

> The Third Circuit framed the relevant timeline as follows:
>
> [R]ed flags were raised at the May 30, 2002 trustee meeting. Then both the Fund's accountant and actuary reported that they still lacked the financial information "required by them to perform their essential functions" such as reporting on the financial condition of the Fund. Further, the record reveals a discrepancy regarding Weinstein's responsiveness to the trustees' prior request for information: while Weinstein claimed to have already provided all information to the new third-party administrator, the administrator reported that it had not received all the previous information and documentation about the Fund. Although Holloway and the trustees developed a plan for the information and documentation to be conveyed to the relevant parties, Holloway's lack of meaningful follow-up after this meeting supports a finding of a breach of her fiduciary duties after May 30, 2002.

Id. at 128 (3d Cir. 2016) (citations omitted).

Accordingly, the Secretary first contends that a prudent fiduciary in Holloway's position would have known, as of May 30, 2002, that such "chronic delays in claims adjudication signaled more profound problems in the Plan's finances." [Dkt. No. 381, p. 15 of 32.] However, Holloway was unsure of the real status of these unprocessed claims, which could have been duplicate claims, paid, or ineligible. She was also under the impression, after the April 23, 2002 meeting, that Oak Tree was provided certain funds to pay claims. (Supp. Trial Tr. 189:21-190:4.)

Moreover, the record reflects that the delay in claims adjudication, as well as delay in financial reports, revolved around a data problem, a problem Holloway actively inquired about. In fact, she reiterated the need for missing information and documents,

18

and even contacted the Fund's counsel to discuss her concerns that Weinstein was "dragging his feet" with regard to the claims data. (Holloway-8 (telling Goldstein: "it is imperative that you demand he cooperate and provide all claims information, listing of members of the union, and current financial status of the fund."). On June 6, 2002, Goldstein informed all of the trustees, including Holloway, that the materials requested from Weinstein were finally received and were being sent to Oak Tree, the accounting firm, and the actuary.[8]  Under these circumstances, the Court agrees with the defense, in that Holloway's actions to obtain the information relating to claims directly after May 30, 2002, were prudent.

The next indication of mismanagement directly followed the receipt of the information needed to process claims, when Holloway's co-trustees fired Goldstein. Shortly after, Holloway's co-trustees also terminated Oak Tree as claims administrator. It is undisputed that both of these unilateral actions were taken without Holloway's knowledge or consent. The record indicates Holloway only learned of these decisions around July 2, 2002. On that date, Holloway wrote a letter to her co-trustees regarding her concerns over their decision to terminate Oak Tree. (Holloway-9). In her letter, Holloway acknowledged that the last transition between third-party administrators was "not smooth," and "members were not being serviced and it severely damaged the

---

[8] Nonetheless, the Secretary argues that Holloway knew or should have known that the Plan was a fraudulent MEWA, no later than June 4, 2002, when the Louisiana Insurance Commissioner issued its Cease and Desist Order against the Plan. Even if Holloway was aware of this order, the extent of her knowledge about the information contained therein is unclear. Moreover, Goldstein assured Holloway that he would respond to these state orders, thus, she reasonably relied on the Fund's attorney in handling the matter, in which Goldstein specifically assured "this is a union-sponsored plan, it is not insurance, you state commissioners don't have jurisdiction over this." Doyle III, 2014 WL 6747882, at *8 ( citing Doyle II, 675 F.3d at 196–97).

PITWU program in the process." (<u>Id.</u>) She suggested that she did not want to impact the members nor encounter legal issues with Oak Tree. (<u>Id.</u>) Holloway's July 2nd letter also references a change in counsel and the DOL: "This is a time of change; new counsel; new actuary; legal responses to DOL, state inquires; trustee changes, to name a few." (<u>Id.</u> at p. 2.) Holloway claims, however, that she learned of Goldstein's termination on July 8, 2002, at which time she first learned of the DOL's investigation of the Fund. (Holloway-10.)

While this record of events, up to July 8, 2002, fail to establish Holloway knew, or could have known, the extent of wrongdoing within the Fund—mainly, that participant contributions were being diverted—she should have known as of July 8, 2002, that the Fund was being mismanaged; and furthermore, that such mismanagement could lead to monetary repercussions. Accordingly, Holloway's actions following July 8, 2002 must reflect her awareness of these "red flags."

The Third Circuit has held, "when confronted with suspicious circumstances, a trustee may be required to investigate potential risks to a plan." <u>Sec'y of Labor v. Doyle</u>, 675 F.3d 187, 198 (3d Cir. 2012) (citing <u>Chao v. Merino</u>, 452 F.3d 174 (2d Cir. 2006). Here, Holloway was confronted with such circumstances: (1) her co-trustees were acting without her consent; (2) Fund Counsel and third-party administrator were fired <u>days</u> after receiving at least some documents from UPC; (3) the Department of Labor was conducting an investigation of the Fund; and (4) when Fund counsel was terminated, he was instructed that he should not communicate with the DOL without consent. To be sure, Holloway admittedly had suspicions as to why counsel and the third-party administrator were terminated. Specifically, Holloway believed Goldstein was fired because "[he] was putting pressure on Mr. Weinstein to give

information to the actuary and accountant." (Supp. Trial Tr. 35-36.) She was also concerned that the Fund was breaching its contract with Oak Tree and risking litigation with the third-party administrator. Holloway knew that a lawsuit, "[f]inacially . . . would be an impact to the Fund," and "Oak Tree . . . had all of the information regarding the claims for the Fund, and that information needed to move over to the new TPA." (Id. at 214:11-14, 215:22-25.) Accordingly, Holloway had a duty to investigate further.

On the record before the Court, however, it is evident that Holloway failed to conduct any meaningful investigation following July 8, 2002. Furthermore, though the Court finds Holloway took certain steps in the interest of the plan's participants and beneficiaries, she did not meet her legal obligations as fiduciary under ERISA, in light of the Fund's circumstances in the months of July, August, and September.

First, despite the distrustful behavior of her co-trustees, Holloway did not seek answers to the fundamental questions she faced: (1) why her fellow trustees terminated Oak Tree and Goldstein; (2) what the basis for the DOL investigation of the Fund was; and (3) why states continued to inquire about the Fund and seek information regarding its legality. The Court recognizes that whether an adequate investigation would have revealed the Fund's potential insolvency and/or the diversion of assets, is unclear.[9] There were, however, other actions that Holloway could have taken. For example, the Secretary suggests that Holloway could have contacted the DOL to apprise them of her suspicions, or her co-trustees' efforts to limit Goldstein's cooperation in the pending investigation.

---

[9] The record indicates that the person with the most pertinent information, Weinstein, was uncooperative and inaccessible; and Weinstein maintained a close relationship to the companies withholding information, as he founded PCI/NP and was the owner of UPC.

As this Court previously found, Holloway also failed to seek mediation of disputes with other trustees regarding the management of the Fund or seek to remove any trustee. Nor did she demand an audit of PCI/NP or PCMG or contact the DOL to complain about the lack of funding, lack of financial accountability, or "chaotic state of affairs." Doyle III, 2014 WL 6747882, at *5 (citing 675 F.3d 193, 199). Holloway indicates a lack of knowledge regarding the actions she could have taken. For example, she argues that "[n]o attorney ever advised [her] that she could or should unilaterally sue a fellow trustee or pursue arbitration or mediation with respect for the Fund. [Dkt. No. 383, p. 34.] But Holloway never inquired about how to resolve the underlying issues with the fund. (Goldstein Dep. 98:12-99:11.)

Instead, Holloway focused on the issues with Oak Tree. (Supp. Trial Tr. 214:11-220:6.) In trying to reconcile the Fund's relationship with Oak Tree, Holloway was in essence, working to remedy the Fund's poor recordkeeping. Although such efforts may have been in the Fund's interest, it cannot excuse Holloway from ignoring the underlying issue of the overall management of the Fund. In fact, Holloway's efforts repeatedly exposed a bigger picture—that her co-trustees, as well as UPC, were intentionally trying to conceal information, that the Fund was not paying out claims, and that both the federal government and state governments were investigating the plan. See, e.g., Russo v. Unger, 845 F. Supp. 124, 128–129 (S.D.N.Y. 1994) (fiduciary's failure to protect the participants by turning a blind eye to her cofiduciary's action constitutes "gross delinquency," despite lack of willfulness or actual knowledge on her part).

For instance, the Fund ultimately settled its differences with Oak Tree in late August, when the Fund agreed to pay Oak Tree $22,000 for its services. (Holloway-11.)

22

On September 10, 2002, however, the then-claims administrator notified Holloway it was still missing necessary files because the Fund failed to pay Oak Tree. (Holloway-30.) Holloway understood that there was adequate funds from the First Union Bank Account to make this payment and advised Fund counsel she obtained authorization for releasing the settlement money. (Holloway-12.) Holloway knew the new third-party administrator was to pay the settlement money "but ha[d] not received any funds for this purpose from Privilege Care, or so they claim[,]" and that Harrison was going to proceed with payment to Oak Tree from First Union Bank, unless he heard otherwise from Maccariella or Privilege Care. (Holloway-13) Ultimately, Holloway learned that the check authorized to pay Oak Tree was returned for insufficient funds. (Holloway-15.) Holloway did nothing when she learned the reason that funds were insufficient— because Franklin Militello unilaterally withdrew the funds from the account leaving an insufficient balance of $1,000. (Supp. Trial Tr. 288:22-291:4.) Militello was initially one of the Fund's Union trustees. (Holloway-4.)

During this time, Holloway was also aware that a previous employer with the Fund, Employers Consortium, filed a lawsuit against the Union alleging unpaid claims, and that there was an inquiry from the State of North Carolina. On September 20, 2002, Holloway learned the Fund's claims administrator was having problems paying claims because PCI/NP had stopped making contributions to the Plan and that necessary information and paperwork from PCI/NorthPoint was lacking. Doyle II, 675 F.3d 187, 198 (3d Cir. 2012). While Holloway understood that Harrison would handle some of these matters, the Court cannot find that her heavy reliance on the Fund's counsel following early July 2002 was reasonable in light of what Holloway describes as a "chaotic state of affairs[.]" (Supp. Trial Tr. 222:2-18; P-38.)

As trustee, Holloway had a duty to maintain financial records and to preserve and protect the assets of the plan, including from diversion or embezzlement. See Restatement (Third) of Trusts §§ 76(2)(b), 83; Ream v. Frey, 107 F.3d 147, 156 (3d Cir. 1997). A trustee is also "under a duty to communicate to the beneficiary material facts affecting the interest of the beneficiary which he knows the beneficiary does not know and which the beneficiary needs to know for his protection in dealing with a third person." Bixler v. Cent. Pennsylvania Teamsters Health & Welfare Fund, 12 F.3d 1292, 1300 (3d Cir. 1993) (quoting Restatement (Second) of Trusts § 173, comment d (1959)).

When Holloway resigned as trustee of the Fund she indicated, *inter alia*, that there was "[n]o financial accountability for contributions to the Health and Welfare Fund by other membership," a "[l]ack of proper follow through to ensure that Union Privilege provided required financial records to the accountants and actuary that determined the financial solvency of the fund," "[v]ulnerability of the fund due to actions taken by membership that has created insolvency of the fund," and "[l]egal issues with the Department of Insurance in multiple states due to the representation by other membership that PITWU is an insurance program." (P-38 (emphasis added).) Therefore, Holloway was aware of the seriousness of the problems within the Fund. Yet, there is no evidence that Holloway went to the participants of the plan with any of this information. Holloway should have informed the beneficiaries of the plan about the concerns she had in order to protect them. Bixler, 12 F.3d at 1300. Therefore, Holloway's inaction after July 8, 2002 until at least her resignation was a breach of her fiduciary duties; and enabled her co-trustees to commit further breach.

A trustee must also take prudent precautions, such as by providing for a "suitable and trustworthy replacement," to ensure that his resignation does not harm the Fund or

its beneficiaries. See Ream v. Frey, 107 F.3d at 154. Holloway did not provide a replacement trustee before resigning, nor was she immediately replaced. Holloway, however, continued to make reasonable efforts to assist the Fund, cure any harm, and participate in its administration. In fact, Holloway stated in her resignation letter: "Should you be interested in utilizing my service to assist in the restructuring of the plan, interface with the fiduciaries or other related support, I would be amenable to performing business related functions to ensure the current issues with this program are rectified." (P-38.) Holloway explained she "still was very motivated to continue trying to fix the problems that we had with the Fund." (Supp. Trial Tr. 234:1-4.)

Holloway demonstrated as much through the following actions. She wrote to Lynn Tucker of IAMU, which PITWU was a part of, to apprise her of the issues caused by the Fund's failure to pay Oak Tree, and request the Union provide funding to execute the termination agreement with Oak Tree. (Holloway 18.) Holloway also contacted the IAMU attorney to advise him of the Fund's issues and her own concerns, noting she believed "maybe naively that with the proper Team this fund can be fixed!!!!!" (Supp. Trial Tr. 238; Holloway-19.) Indeed, on October 7, 2002, McKeough, the Fund's former actuary, advised Ms. Holloway that "[a] fight will be expensive, distracting, and make the problem worse – not better." He opined that the parties should attempt to reach an agreement, "try to mitigate damages; i.e. what can be done to get the current and future claims paid." (Holloway-17.)

Holloway also retained personal counsel, Kevin McMurdy, who she worked with to try to engage Weinstein and assist the DOL in their investigation. (See Supp. Trial Tr. 106-145, 244:25-245:6.) Notably, McMurdy accompanied Holloway on October 20, 2002, when she voluntarily met with Mr. Seirgert at the DOL. (Id. at 2455-6; Holloway-

48.)  Holloway testified that she requested the assistance of the DOL to resolve issues with the Fund. (Id. at 249:8-18.) McMurdy testified that he found it  "strange . . . that the Department would not assist [them] in explaining what could be done to possibly improve the Fund." (Id. at 141:17-23.) He also testified to informing Mr. Seigert about the pending Illinois litigation—

> you have a fund that's being investigated. You have parties to that litigation who are ostensibly being interviewed. So my communication to the Department was, there are things going on up there that may ultimately end in their solution of claims. Would you like to be involved in that case because it's getting ready to wrap up? And I was told no, we don't want to be involved, you can tell us about it afterwards. And I said, okay.

(Id. at 140:23-141:5.) Furthermore, McMurdy sought Mr. Seigert's "generally requested assistance from the Secretary to provide us with whatever assistance could be provided to try and solve whatever problems there might be." Mr. Seigert would not give Holloway and her attorney any information or assistance aside from a contact person's information—this person had no other information for Holloway. (Id. at 106-107.)

Moreover, Holloway was regularly providing claims status data from the Fund to her attorney to keep him apprised of the situation. (Holloay-56-67; Supp. Trial Tr. 250:11-260:11.) Through McMurdy Holloway made efforts to secure funds to pay pending claims, including initiating law suits. (Supp Trial Tr. 261:5-10.) In fact, Holloway's own company, EDI, negotiated with providers on payment terms, and funded the extensive work effort to go through boxes of claims and records. (Id. at 253:14-22; 257:10-21.) The record shows Holloway's desire to take responsibility in helping the fund and protect her own company, after all, her company remained a contributing employer of the Fund. Although "a duty to disclose material information may extend beyond [a trustee's] departure[,]" Holloway acted prudently and met her

obligations prescribed by the law after her resignation. Glaziers & Glassworkers Union Local No. 252 Annuity Fund v. Newbridge Sec., Inc., 93 F.3d 1171, 1183 (3d Cir. 1996) Therefore, Holloway is not liable for the diversion of plan assets after September 2002. Finally, the Court finds that Holloway is not liable for the actions of her co-trustees following her resignation because she took reasonable action to prevent further harm from their actions.

ERISA § 409(a) provides that "[a]ny person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this title shall be personally liable to make good to such plan any losses to the plan resulting from each such breach...." Where several fiduciaries are involved in ERISA-violative conduct, the liability is joint and several. Davidson v. Cook, 567 F. Supp. 225, 240 (E.D. Va. 1983); Freund v. Marshall & Ilsley Bank, 485 F. Supp. 629, 644 (W.D. Wis. 1979). Further, ERISA section 409(a) specifies that "[a]ny person who is a fiduciary with respect to a plan who breaches any of [his] duties shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary." 29 U.S.C. § 1109(a).

Holloway argues that the Secretary has failed to carry his burden to prove any quantifiable amount of damages that could be attributed to her. [Dkt. No. 383, p. 30.] The Court disagrees. Bindu George ("Ms. George"), senior investigator with the DOL, Employee Benefits Security Administration, testified at the initial trial, and the supplemental trial before this Court. She calculated the Plan losses that occurred monthly, using simple math and the amounts provided in P-39, P-41, and P-46—the Fund's Summary of all Deposits in Connection with Operation of the Fund, Deposits Received by contract administrators, and the Total Funds Retained by PCI, NP, and

PCMG after Payments made to Third-party Administrators and Direct Payments to

Provide Benefits. At trial, the Secretary presented a chart of these calculated losses,

which Ms. George testified to as being accurate. (Supp. Trial Tr. 59:19-61:8.)

The Court used these calculations in determining Doyle's liability to the Fund in

Doyle III. In relevant part, this Court has already determined that

> Doyle's company, PCMG, marketed the services of a variety of entities, including PCI/NP. In January of 2002, Doyle signed a Marketing Service Agreement with PCI, in which PCMG agreed to market PCI's services for a fee. PCMG also collected payments from PCI/NP's clients. Clients made payments by two checks, one to PCI/NP for participation in the Fund (Check 1), and one to PCMG for administrative service fees (Check 2). PCMG received both checks and would forward the first on to PCI/NP. It retained the second check to cover its expenses, which included sales commissions paid to PCMG's sales consultants and fees for additional services selected by the client, such as gap insurance. PCMG also provided monthly reports to PCI/NP regarding funds received and paid certain union dues. 675 F.3d at 191–92.

> At some point, PCMG stopped marketing for PCI/NP, but continued to provide billing and administrative services until May 2003. PCMG received $4.5 million in Check 1 funds, and $2.1 million in Check 2 funds. PCMG forwarded $3.1 million of the Check 1 funds to PCI/NP, and paid $645,000 directly to claim administrators and medical providers. In addition to the $3.1 million received from PCMG, PCI/NP also directly received $816,000 from employers enrolled in the Fund through Weinstein's wife. Of this roughly $3.9 million, PCI/NP sent $2.1 million to claims administrators to pay employee health benefit claims. Thus, in total, PCMG and PCI/NP collected $7.4 million in payments relating to the Fund, but only $2.7 million was sent to claim administrators for the payment of health benefit claims. The remaining $4.7 million was retained by PCMG or PCI/NP. 675 F.3d at 192.

Doyle II, No. 05-CV-2264, 2014 WL 6747882, at *3. The Secretary has stipulated that all

monies PCI/NP and PCMG forwarded to the Fund's claims administrators were used

payment of legitimate claims and to defray reasonable costs of administering the health

plan. Id. at *15.

The Third Circuit has affirmed this Court's conclusion that that all of the contributions paid by employers, both "Check 1" and "Check 2," were plan assets and, therefore, contributions paid by employers that the Plain did not use to pay claims or defray reasonable administrative costs constitutes a Plan loss. The Circuit further affirmed this Court's judgment against Doyle based on the above findings. For purposes of this remand, the Court is now only concerned with the losses occurring between June 2002 and May 2003.

According to the DOL's monthly calculations, the total amount of diverted funds between June 2002 and May 2003 amounts to $3,344,678.01. Having found that Holloway, as a named trustee, was in breach of her fiduciary duties beginning July 8, 2002, until her resignation on September 27, 2002, she is liable for damages occurring in August 2002 and September 2002.[10] As established, $454,880 was diverted in August of 2002 and $321,829 was diverted in September 2002, totaling $776,709— this total, therefore, represents the loses of the Plaintiff that Holloway is responsible for.

III.   Conclusion

For the foregoing reasons, Defendant Holloway is jointly and severally liable along with the other defendants to restore and make restitution to the Fund in the amount of $776,709. This amount represents the difference between the money that employers paid in for benefits and the money that was paid out to claims administrators to administer and pay benefits—plan assets diverted from the Fund—during August 2002 and September 2002. During those two months, Holloway ignored the evidence of her co-trustee's wrongdoings, and failed to take meaningful action, breaching her

---

[10] The Secretary agrees that a July 8, 2002 "trigger date," implicates liability for damages beginning in August. [Dkt. No. 381, p. 28 of 32.]

fiduciary duties of loyalty and prudence, and further enabling others to commit breach against the Fund and its beneficiaries. Holloway is also to be enjoined from serving as a fiduciary or service provider for any ERISA-covered employee benefit plan.

The restored losses to the Plan may be subject to computation of prejudgment interest by the Secretary. The Court, however, reserves on the issue at this time. See Anthuis v. Colt Indus. Operating Corp., 971 F.2d 999, 1009 (3d Cir. 1992) ("[W]e have held generally that '[i]n the absence of an explicit congressional directive, the awarding of prejudgment interest under federal law is committed to the trial court's broad discretion.'" (quoting Ambromovage v. United Mine Workers, 726 F.2d 972, 981–82 (3d Cir. 1984))). The Parties should submit to the Court supplemental briefing as to whether prejudgment interest should be awarded and, if awarded, the appropriate rate of that interest.

Dated: November 13, 2020


       /s/ Joseph H. Rodriguez
       Hon. Joseph H. Rodriguez,
       UNITED STATES DISTRICT JUDGE